RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 14-2159

*v.*

ALVIN RAY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20143-1—Avern Cohn, District Judge.

Argued: June 12, 2015

Decided and Filed: September 23, 2015

Before: KEITH and CLAY, Circuit Judges; MARBLEY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Mark H. Magidson, Detroit, Michigan, for Appellant. Shane Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Mark H. Magidson, Detroit, Michigan, for Appellant. Shane Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

MARBLEY, District Judge. Appellant Alvin Ray ("Ray") appeals his jury conviction for one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), two counts of possession with intent to distribute controlled substances (cocaine and marijuana), in violation of

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

21 U.S.C. § 841, and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Ray presents several claims of error, challenging the admission of his prior criminal conviction, the sufficiency of the evidence to sustain a conviction under 18 U.S.C. § 924(c), the admission of his alleged confession under the Fifth Amendment, the denial of a discovery request, the denial of a motion to suppress, and the instructions given to the jury. On the issue of whether the district court erred in admitting Ray's alleged confession, we **REVERSE** and **REMAND** for an evidentiary hearing in accordance with this Opinion. We **AFFIRM** on all other issues.

## I.  BACKGROUND

### A.  *Factual Background*

Sometime prior to August 22, 2012, the Detroit Police Department ("DPD") claims it received complaints that narcotics were being sold from a residence located at 9241 Genessee Street, Detroit, Michigan. (R. 31, Mem. and Order Denying Def. Mot. to Suppress at 2). On August 22, 2012, DPD Officer Aaron Yopp used a "confidential informant" ("CI"), to make a controlled buy at 9241 Genessee Street. (R. 38, *Franks* Hearing Tr., July 29, 2013, PageID 108-110, 112). Officer Yopp indicated that DPD had received complaints about drug activity at the residence, but he had not conducted any surveillance of the home prior to the controlled buy. (*Id*. at 109-10).

Officer Yopp picked up the CI at an undisclosed location, took him to 9241 Genessee Street, and provided him with cash. (*Id*. at 120-22). From his parked vehicle, Officer Yopp observed as the CI went to the front door of the residence, but was unable to see the person with whom the CI interacted on the other side of the door. (*Id*.). According to Officer Yopp, the CI returned to Yopp's vehicle with a knotted bag of 0.8 grams of marijuana. (*Id*.). The CI told Yopp that he purchased the marijuana from a black male, age 33–37, 5'9", 230 pounds, with a medium complexion, bald head, and a fat face. (*Id*. at 122). The CI also stated that the subject was Ray. (R. 31, Mem. and Order Denying Def. Mot. to Suppress at 3). Based on this information, Officer Yopp applied for a search warrant to search the residence located at 9241 Genessee Street. The search warrant was signed the same day.

The next day, August 23, 2012, DPD officers executed a search warrant at the residence located at 9241 Genessee Street.  (R. 89, Tr. Jury Trial, Vol. 1, May 19. 2014, PageID 655).  Upon arrival at the home, the officers encountered a teenage boy on the sidewalk.  The boy indicated that Ray was his father, and that Ray was inside the home.  (*Id*. at 731-32).  The officers then walked to the front door, knocked, and announced that they had a search warrant. (*Id*. at 658-59).  No one responded at the door.  (*Id*. at 733).  The officers claim they found the door unlocked, and so they entered, announced themselves, and secured the inside of the home. (*Id*.).

Officer Gregory Robson and Officer Jeffrey Pacholski testified that they found Ray and his longtime girlfriend and mother of his 14-year old child, Cara Lee, sleeping in the southeast upstairs bedroom.  (*Id.* at 661, 735).  DPD officers awoke the pair and escorted them downstairs to the living room.  (*Id.* at 660-61, 736).  Once Ray and Lee were secured, DPD officers searched the home.  (*Id.* at 659-61).

The bedroom where Ray and Lee were found held an air mattress and a television on a stand.  (*Id.* at 661-63, 738-39).  Officers Robson and Pacholski testified that, during the search, DPD officers discovered a plastic sandwich bag on the television stand, next to mail addressed to Ray and pill bottles prescribed to him.  (*Id.* at 742). The plastic bag contained 31 individually packaged bags of marijuana and $148.  (*Id.* at 665-66, 708-09, 741-42).  Three shotgun shells were found on the television stand, as well.  An unloaded 12-gauge shotgun was found leaning against the wall behind the bedroom door.  (*Id.* at 662-63, 739-40).  Officer Pacholski also found a loaded .22 caliber rifle in the closet of a second bedroom in the southwest corner of the home. (*Id*. at 746).[1]  No drugs or drug paraphernalia were found in the second bedroom.

In the kitchen, on the main floor of the home, the officers found a bag of loose marijuana. (*Id*. at 747, 757).  In the pocket of a Detroit Tigers coat hanging in the living room closet, Officer Robson found a plastic bag filled with 49 smaller bags of crack cocaine.  (*Id*. at 669-71).  Also recovered in the search from the same living room closet was a fully loaded .380 caliber semi-automatic handgun in the pocket of a different jacket – a Columbia jacket.  (*Id*. at 672-74).

---

[1]The officers also found a third rifle in the basement of the home, but it was determined not to work and was not charged in the indictment.

Officer Pacholski claimed no evidence – such as mail, clothing, or medication – was found suggesting that anyone other than Ray lived in the residence.  (*Id*. at 737, 751-52).

Officer Robson also testified at trial that during the execution of the search warrant, he had a conversation with Ray and Lee while they were secured in the living room, but before any *Miranda* warning had been given.  According to Officer Robson, the parties discussed Lee's employment, and Ray informed the officer that, when he first heard the officers shouting, he thought the police were in the neighborhood to raid a neighbor's house.  (*Id*. at 678, 717-18).  He stated that he had a "general conversation" with Ray and Lee and discussed "[n]othing pertaining to the case."  (*Id*.).  Ray, on the other hand, testified that, as his home was being searched, he spoke with two officers, one whose name he did not recall and one called "Wolverine."  Ray claims "Wolverine," later identified as Officer Patrick Hill, informed Ray that both he and Lee were going to be arrested.  (R. 91, Tr. Jury Trial, Vol. 3, May 22, 2014, PageID 957-60).  Ray claims that he took responsibility for the illegal items found during the search so that he and Lee's son would not have to see Lee taken out of the house in handcuffs.  (*Id*.).  After the search concluded, the officers released Lee at the home, but arrested Ray and took him to the police station.  (R. 89 at 680).

Officer Robson testified at trial that, at the police station, he and Officer Hill interrogated Ray together.  (*Id*. at 684-85).  Officer Robson indicated that he observed Officer Hill give Ray his *Miranda* rights.  (*Id*. at 684-85).  Officer Robson also testified that Ray signed a *Miranda* waiver, on which Ray indicated that he understood his rights by initialing each paragraph explaining his rights, and agreed to answer the officers' questions.  (*Id*. at 685-87).  Further, Robson testified that, during the interrogation, Ray admitted that he sold marijuana that he purchased from others in the neighborhood.  (*Id*. at 693).  According to the officers, Ray also stated that he had lived in the 9241 Genessee Street residence for ten years; he acknowledged that the 12-gauge shotgun belonged to him; he denied ownership of the other guns in the house, claiming they belonged to his girlfriend's uncle, who recently died; and he admitted that he was aware of the crack cocaine found in the coat closet, though he claimed that a friend had left it at a party held at the house the night before.  (*Id.* at 691-94).

## B.     *Procedural History*

On February 21, 2013, the Federal Grand Jury returned an indictment charging Ray with four counts: (1) Felon in Possession of a Firearm, 18 U.S.C. 922(g)(1), in violation of 18 U.S.C. 924(a)(2); (2) Possession with Intent to Distribute Controlled Substance – Cocaine, in violation of 21 U.S.C. 841(a)(1) and 21 U.S.C. 841(b)(1)(C); (3) Possession with Intent to Distribute Controlled Substance – Marijuana, in violation of 21 U.S.C. 841(a)(1) and 21 U.S.C. 841(b)(1)(D); and (4) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. 924(c) and 18 U.S.C. 924(c)(1)(A)(i).  (R. 7, Indictment, PageID 11-12).

### 1.     *The* Franks *Hearing*

Following Ray's arrest and detention without bond, the Defense filed a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), challenging the veracity of the statements made supporting the warrant that authorized the search of Ray's home and requesting suppression of the evidence discovered during the execution of the search warrant – specifically, the cocaine, marijuana, and firearms.  (R. 23, *Franks* Motion, PageID 36-44).  The district court granted Ray's request for a *Franks* hearing, which the court held on July 29, 2013.

At the hearing, and in its motion, the Defense argued that the Officer Yopp's affidavit was insufficient to establish probable cause for a search warrant because:  (1) Yopp was untruthful in the affidavit when he averred that he received complaints about narcotics being sold at Ray's home prior to August 23, 2012; and (2) Ray in fact did not sell marijuana to the CI on August 22, 2012.  (R. 23; R. 38 at 101-103).  Ray did not call any witnesses or otherwise proffer any evidence to the court.  (R. 31, Mem. and Order Denying Def. Mot. to Suppress Evidence at 2).

The Government called two witnesses: (1) the affiant, Officer Yopp; and (2) DPD Sergeant Jason Sloan.  (R. 38 at 106).  Officer Yopp testified that he received narcotics complaints about drug dealing at the address of 9241 Genessee Street, but that he could not recall any of the specific complaints, nor could he remember if any complaints were made to him directly or whether he learned of them through another officer.  (*Id*. at 110, 123-25).  He also testified that none of the complaints made about 9241 Genessee Street was recorded or otherwise

memorialized.[2]  (*Id*. at 113, 123-25).  Defense counsel insisted that the Defense's investigator could not uncover any complaints made regarding the subject home, but the Defense did not call the investigator to testify or call any other witnesses at the hearing.  (*Id*. at 101-102).  The Defense only offered Ray's affidavit stating that no one purchased marijuana from him on the day of the controlled buy.  (R. 23-2, Ray Aff., PageID 46).

After consideration of the evidence presented at the *Franks* hearing, the trial court denied Ray's request to suppress the evidence discovered during the execution of the warrant.  (R. 31 at 88).  The court held that, based on the totality of the circumstances, the police had probable cause to believe that narcotics would be found at Ray's home, the search warrant was properly executed, and the Government had established by a preponderance of the evidence that the evidence was admissible.  (*Id*. at 88).

### 2.    *Ray's Motion Seeking Discovery of the CI's Identity*

Also prior to trial, Ray filed a motion requesting discovery of the CI's identity and other background information about the CI.  (R. 40, Discovery Mtn., PageID 156-65).  The trial court also denied that motion.  (R. 45, Mem. and Order Denying Mtn. for Discovery, PageID 204-11).  Ray sought the identity of the CI because he did not believe anyone purchased marijuana from his home on August 22, 2012.  (R. 40 at 160).  Ray also sought photos, rough notes, and police logs to determine the time the alleged controlled buy took place.  (*Id*. at 161).  The trial court found that Ray's motion was, in effect, a motion for reconsideration of the court's decision denying his motion to suppress the evidence seized during the execution of the search warrant.  (R. 45 at 207).  Further, the trial court determined that, because Ray was not charged with the controlled buy involving the CI, the CI could not testify as to any relevant fact in the case and, therefore, disclosure of the CI's identity or the circumstances of the controlled buy were irrelevant and not essential to a fair trial.  (*Id*. at 207-208).

---

[2]Officer Yopp testified that, typically, DPD officers only record narcotics complaints from individuals using the DPD's narcotics hotline number and complaints made to the DPD's Ombudsmen.  (R. 38 at 124).

### 3. Ray's Motion to Suppress Confession

Before trial, the Defense also moved the court to suppress Ray's statements made to the police, arguing they were made involuntarily. (R. 42, Mtn. to Suppress Statements, PageID 171-72). Ray argued that his confession was involuntary because he was coerced: he claims that, as his home was being searched, an officer advised him that if he did not cooperate and take responsibility, his child's mother, Cara Lee, also would be arrested and their 14-year old son would become a ward of the state. (*Id*. at 172). Ray also claimed that, at some point while he was being interrogated, he was told that his statements were "off the record." (*Id*. at 173).

The trial court denied Ray's request to suppress his statements without a hearing, finding such a hearing would "only serve as an unnecessary delay." (R. 45 at 208-210). The court found that the Government met its burden to demonstrate by a preponderance of the evidence that Ray's confession was voluntary because Ray's confession at the police station was given after he was *Mirandized*. Further, the trial court found that there was "ample evidence" to suggest that Ray confessed as a result of the evidence seized from his home, not any alleged threat or coercion. (*Id*. at 209).

### 4. Ray's Motion in Limine to Suppress Ray's Prior Record and Use of the Word "Felon"

The Defense also filed a motion *in limine* to suppress the use of Ray's prior criminal record and to prohibit Ray's charge under 18 U.S.C. § 922(g) from being referred to as a "felon in possession" charge in front of the jury. (R. 49, Mtn. *in Limine*, PageID 228). The Defense proposed that, instead of using the phrase "felon in possession," the jury be told that Ray was charged with "unlawfully possessing a firearm." (*Id*. at 233-34). At a subsequent hearing on the motion, Defense again objected to the introduction of Ray's criminal convictions.[3] Defense counsel also reiterated his objection to "using the word 'felon' as described to the – in this charge," pointing out that the statute is not entitled "felon in possession." (R. 88, Hrg. on Mot. *in Limine*, Tr. Feb. 18, 2014, PageID 617, 621).

---

[3]At the hearing, Defense counsel indicated his understanding that Ray had three prior convictions that presented evidentiary concerns under Fed.R.Evid. 609: "As I understand it, Judge, he had possession -- there was possession of a controlled substance, possession of carrying a concealed weapon and a prior conviction for being a felon in possession of a weapon." (R. 88 at 614).

On the issue of the introduction of Ray's prior convictions, the trial court declined to make an advance ruling about the admissibility of the prior convictions, deferring the issue to be decided at trial if Ray decided to testify. (*Id*. at 615). The district court did not explicitly rule on the Defense's argument that the use of the title "felon in possession" would be prejudicial to Ray, either at the hearing or in the written order denying Ray's motion in limine (R. 63, Order Denying Def. Mot. in Limine). The district court only indicated that there was "nothing to discuss" and that "if you [Defense counsel] can come up with something [instead of "felon in possession"], you do."[4] (R. 88 at 617, 621).

### 5.    *Additional Relevant Trial Testimony*

At trial, Ray and Lee both testified that the 12-gauge shotgun found in the southeast bedroom was not present in the bedroom when the home was searched. (R. 77, Mem. and Order at 3; R. 91 at 868, 972-73, 950-91). It was also established at trial that the .22 caliber rifle found in the closet of the southwest bedroom was registered to Patsie Lee, Cara Lee's mother and the person who owned the home. (R. 91 at 893). In addition, multiple defense witnesses testified that they attended a party at 9241 Genessee Street, held for Ray and Lee's birthdays, the night before the search. (R. 77 at 3).

During Ray's testimony, he indicated that the cocaine and .380 caliber handgun found in the closet were not his; he insisted that the items belonged to an acquaintance, Anthony Maddox, who came to the party "dirty" – meaning, carrying the drugs and firearm. (R. 91 at 941-45, 956-57). Ray also testified that, at some point shortly after Maddox's arrival at the party, he became aware that Maddox had a gun, asked Maddox to put it away, and witnessed Maddox put items in the closet where the .38 and cocaine were later found by police. (*Id*. at 956-57, 972, 975). Ray indicated that he did not want Maddox around his party guests, and so he asked Maddox to leave whatever he had with him, then called a Checker cab and sent Maddox home. (*Id*.). On cross-examination, the Government pointed out that Maddox lived in the same neighborhood as Ray, and Ray admitted that he did not possess a phone record proving that he called the cab company. (*Id*. at 975-76).

---

[4]Ray evidently understood the trial court's comments to amount to a ruling "that the use of the title 'felon in possession' rather than 'unlawful possession' was not prejudicial," although the district court did not make such an explicit statement on the record. (Appellant Br. at 15).

During his testimony, Ray also admitted that the marijuana found in the home was his; he said he sold it to and traded it with friends.  (*Id*. at 939-40).  In addition, on direct examination, he informed the jury that he had a "prior gun case" in 2005 to which he had pleaded guilty.  (*Id*. at 937-38).

### 6.	*Jury Deliberation and Request for Clarification*

After deliberating for two hours, the jury asked for clarification about the phrase "advance and promote" in relation to count four, possession of a firearm in furtherance of a drug trafficking offense.  (R. 92, Tr. Jury Trial, Vol. 4, PageID 1064).  After a brief discussion with counsel for the parties and consulting the Sixth Circuit Pattern Jury Instructions, the district court gave a clarifying instruction.  (*Id*. at 1068).  Shortly thereafter, the jury convicted Ray on all four counts.  (R. 71, Verdict, PageID 350).

### 7.	*Ray's Motion for Judgment of Acquittal*

Following the trial, Ray filed a motion for judgment of acquittal on Count Four, possession of a firearm in furtherance of drug trafficking.  (R. 75 at 372-80).  In the motion, the Defense argued that insufficient evidence existed for the jury to find that Ray possessed a firearm "in furtherance of" a drug trafficking crime.  (*Id*. at 379-80).  Ray also insisted that the 12-gauge shotgun could not have been used in furtherance of drug trafficking because it was not loaded.  (*Id*. at 379).

The district court denied Ray's motion for acquittal.  (R. 77, Mem. and Order Denying Def.'s Mot. for Judgment of Acquittal, PageID 388).  The court found that any rational juror could have found Ray guilty of possessing any of the three firearms found in his house in furtherance of trafficking the crack cocaine or the marijuana found in his home.  (*Id*. at 399).  Thus, the court concluded, "[v]iewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime."  (*Id*.).

### 8.	*Ray's Sentence and Appeal*

On September 2, 2014, Ray was sentenced to 84 months in prison – 24 months for Counts One, Two, and Three, to be served concurrently, and 60 months for Count Four, to be

served consecutively to the sentence for the prior three counts. (R. 93, Sent. Tr., PageID 1082; R. 85, Am. Judgment, PageID 457). On September 15, 2014, following the imposition of the sentence and entry of judgment (R. 82, Judgment, PageID 446-48), Ray timely appealed his conviction. (R. 83, Notice of Appeal, PageID 453).

## II.    DISCUSSION

### A.    *Use of "Felon" During Voir Dire, Trial, and Jury Instructions and Admission of Prior Felony Conviction under Rule 609(a)*

Evidentiary rulings by the district court are reviewed for abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (*quoting United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). This Court "will overturn a ruling on the admissibility of evidence only if the district court 'committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors[,] ... improperly applie[d] the law[,] or use[d] an erroneous legal standard.'" *Id.* (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)). In addition, "[r]eversal is appropriate only if the abuse [of discretion] was not harmless error." *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007). That is, reversal is appropriate "only if the erroneous evidentiary ruling affected the outcome of the trial." *Marrero*, 651 F.3d at 471; *see also United States v. Castle*, 596 F. App'x 422, 424-25 (6th Cir. 2015) ("We will reverse an evidentiary ruling only when a defendant's substantial rights were affected by the evidence's admission.").

In his first issue on appeal, Ray actually alleges two distinct errors by the trial court: (1) that the trial court abused its discretion by allowing the use of the title "felon in possession" to describe him under 18 U.S.C. § 922(g) in front of the jury; and (2) that the trial court abused its discretion by admitting his prior felony conviction under Rule 609(a). We will address each sub-issue *seriatim*.

### 1.    *Use of the Term "Felon" During Voir Dire, Trial, and in the Jury Instructions*

Ray first contends that the trial court abused its discretion by allowing his charge under § 922(g) to be referred to as a charge for "felon in possession," effectively calling him a "felon," in front of the jury, including during voir dire, and at trial. (Appellant Brief at 15). Ray insists

that the use of the word "felon" in describing the charge is more prejudicial than probative under Federal Rule of Evidence 403. (*Id*. at 16-17). Labeling someone a "felon" is highly prejudicial, Ray contends, because of the societal stigma associated with being a felon. Ray maintains that "there is bias and prejudice against felon offenders in the general public," citing publications discussing felon disenfranchisement laws as an example of such bias. (*Id*. at 23). Ray insists that learning a defendant's criminal history, even generally, is likely to bias the jury against the defendant and, in general, creates a substantial risk that a jury will convict for crimes other than those charged or because they believe that the defendant is a bad person who deserves punishment.[5] (*Id*. at 18, 23). He also points out, accurately, that § 922(g) is not formally titled "felon in possession," nor does the statute use the word "felon" in its text, thus, it is not necessary that a charge under § 922(g) be labeled as such. (*Id*. at 21). At oral argument, Ray also pressed this Court to consider the implicit bias aroused by and associated with the term "felon."

Instead of referring to Ray as a "felon" or using the phrase "felon in possession," the Defense requested that alternative language be used, which he claims would have been "less unfairly prejudicial." Specifically, the Defense asked that the jury be told only that Ray was "ineligible" to possess a weapon. (*Id*. at 22). The Defense also offered to stipulate that Ray did not have a license to carry a weapon and that he was not eligible to carry one. (*Id*.). And in fact, the parties ultimately did stipulate to the fact of Ray's status as a felon at trial.

For these reasons, Ray insists that the trial court abused its discretion by stating several times during voir dire "that Ray was being charged as a 'felon in possession' of a firearm," and by using the word "felon" to question the jurors' about whether they believed that a defendant with a prior record had the propensity to commit the charged offense. (*Id*. at 18, citing R. 86, Voir Dire Tr., at 55, 92, 97, 106, 117-18, 124). In addition, Ray argues the trial court abused its discretion by allowing Ray to be referred to as a "felon" during trial – during the direct examination of Officer Robson, (R. 89 at 694), and when the Government read into the record a

---

[5]Ray points out that this same reasoning is reflected throughout the Federal Rules of Evidence, such as Fed.R.Evid 404(b), which generally prohibit the use of "propensity evidence" as a basis for conviction of the crime for which a defendant presently is charged.

stipulation between the two parties that Ray was in fact a felon, an element of the Government's case under 18 U.S.C. § 922(g).[6]

The Government insists that Ray's request at trial that the jury only be told that Ray was "ineligible" to possess a firearm was an improper attempt "to limit the jury's consideration to only one of the elements required for a felon-in-possession conviction – possession" and "would have precluded the jury from making a finding of each element necessary to find him guilty of the statute he was charged with violating." (Appellee Brief at 16-18). Further, the Government argues that any unfair prejudice Ray claims as a result of the use of the term "felon" during voir dire and at trial is "entirely speculative" because the district court sufficiently probed the jury pool about biases against felons and instructed the jury to consider only the evidence before it during its deliberations. (*Id.* at 18 n. 5).

In this case, the district court did not abuse its discretion by using, or allowing the use of the word "felon" or the phrase "felon in possession" to describe Ray's charge under § 922(g). As Ray points out, § 922(g) does not use the word "felon," either in the title or text of the statute: it refers only to a person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, which is an element the Government must prove during its case-in-chief. Although *Old Chief* requires the Government to accept a defendant's offer to stipulate to a prior felony conviction, *see Old Chief v. United States*, 519 U.S. 172, 191, 117 S. Ct. 644, 655, 136 L. Ed. 2d 574 (1997) (holding that "it was an abuse of discretion to admit the record when an admission was available"), it is still the Government's burden to prove each element of the offense and, likewise, generally the jury must make a finding as to each element, even where there is a stipulation to the elemental facts. *See United States v. Jones*, 108 F.3d 668, 674-76 (6th Cir. 1997). And, in fact, the parties entered into such a stipulation here.

---

[6]The stipulation, as read into the record, stated: "It is agreed and stipulated between the undersigned counsel for the Government and Mr. Magidson, with the Defendant's consent, that prior to that date, so before August 23rd, 2012, Mr. Ray had been convicted of a felony, so that's a crime punishable by more than one year in prison, knew he had been convicted of a felony and had not had his conviction expunged or his rights restored and that we could call a witness to prove that if we had to." (R. 89 at 758).

While it appears that this Circuit has not explicitly addressed the unfair prejudice that may arise solely as a result of the repeated use of the word "felon" in reference to a defendant, courts in this Circuit have recognized the potential unfair prejudice that may arise as a result of trying a charge under § 922(g) with other charges arising from the same underlying conduct.[7] Further, we recognize the proven impact of implicit biases[8] on individuals' behavior and decision-making. Social scientists have examined extensively the theory of implicit bias in recent decades, especially as it relates to racial bias. *See, e.g.*, Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 HARV. L. & POL'Y REV. 149, 152 (2010); Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. REV. 465, 465 (2010); Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 DUKE L.J. 345, 345 (2007).

---

[7]To alleviate any such unfair prejudice, courts in this Circuit have determined that it may be appropriate to try separately or bifurcate a charge for "felon-in-possession" or implement other safeguards, such as introducing the fact of the defendant's felony conviction by stipulation, providing a limiting instruction emphasizing that the jury should give separate consideration to each count of the indictment, or giving a specific jury instruction to consider the prior conviction only as it relates to the felon-in-possession charge. *See generally, e.g.*, *Old Chief v. United States*, 519 U.S. 172, 194, 117 S. Ct. 644, 656, 136 L. Ed. 2d 574 (1997); *United States v. Cope*, 312 F.3d 757 (6th Cir. 2002); *United States v. Mayhew*, 337 F. Supp. 2d 1048, 1059-60 (S.D. Ohio 2004).

[8]The concept of "implicit bias" is defined, generally, as bias that is "not necessarily openly and explicitly expressed, but [is] harbored nonetheless." Implicit biases are "often not conscious, intentional, or maliciously-based," as opposed to explicit bias – generally defined as "bias that is openly expressed." Melissa L. Breger, *The (in)visibility of Motherhood in Family Court Proceedings*, 36 N.Y.U. REV. L. & SOC. CHANGE 555, 560 (2012). Further:

> [W]hile explicit biases may be shunned and disapproved of in public, implicit biases only strengthen and "harden[]" over time, becoming part of one's core set of beliefs. Distinct from explicit biases, not all implicit biases take the shape of outward animosity or hatred toward a particular group. One can hold beliefs stemming from seemingly innocuous stereotypes, which then subsequently form cognitive schemas and implicit biases.

> Given its nature, the problem of implicit bias is extensive and pervasive, and its effect is substantial. Researchers argue that these implicit biases can predict behavior, impacting both mundane behavior, such as whether someone engages in simple acts of courtesy, and consequential behavior, such as how someone evaluates another person's work quality.

*Id.* at 560-61; *see also* Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 HARV. L. & POL'Y REV. 149, 152 (2010) ("Implicit biases [unlike explicit biases] ... are unstated and unrecognized and operate outside of conscious awareness. Social scientists refer to them as hidden, cognitive, or automatic biases, but they are nonetheless pervasive and powerful. Unfortunately, they are also much more difficult to ascertain, measure, and study than explicit biases.").

In light of such concerns, and because the word "felon" is not used in the statute, there is no reason a court could not use alternative language – such as the language of the statute – instead of labeling the defendant a "felon" or referring to a charge under § 922(g) as "felon in possession." Indeed, if a court conducted a Rule 403 analysis and concluded that the use of the term "felon" or "felon in possession" was unfairly prejudicial, we see no reason such a ruling should not be upheld.

In this case, however, this Court cannot say that the trial court abused its discretion in allowing the term "felon" to be used in reference to Ray. Here, the word "felon" was used by the trial court during voir dire in an attempt to weed out those jurors who would be unable to make an unbiased decision about Defendant's guilt based on knowledge of his prior criminal history alone – the very concern Ray addresses here. Further, one of the references to Defendant as a "felon" during trial was through the reading of the parties' stipulation, entered into by Ray, so that the facts of his prior felony convictions did not have to be entered into evidence in order for the Government to prove a required element of its case under § 922(g). Moreover, the second reference to Ray as a felon during trial was by a Government witness, Officer Robson, reading Ray's affirmative answer to the question "were you aware that you were a convicted felon" from Officer Hill's notes taken during Ray's alleged statements at the police station. The Defense did not object to this portion of the direct examination. (R. 89 at 365).

In this context, the district court did not abuse its discretion in allowing the word "felon" to be used. Even if an abuse of discretion was shown, however, there is no evidence to indicate that the effect of the use of the word "felon" alone was so substantial that it affected the outcome of the trial. *Marrero*, 651 F.3d at 471. Thus any error that may have occurred was harmless.[9]

---

[9]Notwithstanding this holding, this Court notes its preference that district courts explicitly address each objection made by the parties on the record. When Defense counsel objected to the use of the word "felon" during a pre-trial hearing on motions *in limine*, the trial court did not address the issue specifically, engage in any discussion of Rule 403 balancing, or otherwise provide any reasoning as to his decision to overrule the motion. That hearing was followed by a one-sentence written order denying Ray's motion. Ray's objection, while perhaps uncommon, is legitimate under Rule 403 and litigants should be assured that their objections will be fully heard and that a record thereof will be made for appeal.

## 2.        *Admission of Prior Felony Conviction under Rule 609*

Ray next argues that the trial court abused its discretion by admitting, for impeachment purposes under Federal Rules of Evidence 609(a), Ray's prior felony conviction for being a felon in possession of a firearm under § 922(g). Under Rule 609(a), crimes that are less than ten years old and not considered crimes of dishonesty are admissible if the probative value outweighs the prejudicial effect. *See, e.g., United States v. Cox*, 159 F. App'x 654, 658 (6th Cir. 2005).[10] Further, a trial court "has broad discretion to admit evidence of prior convictions after conducting the probative value/prejudicial effect inquiry." *United States v. Sloman*, 909 F.2d 176, 181 (6th Cir. 1990). "Even if this court concludes that the district court's ruling was erroneous, the defendant must demonstrate substantial prejudice to be entitled to a reversal." *Id*.

Here, even if we found that the trial court erred by granting admission of Ray's 2006 conviction under § 922(g), which is one of the charges against Ray in the present case, it does not appear that the Government introduced such evidence during its cross-examination of Ray or otherwise during the trial proceedings. Thus, any error that may have occurred by the trial court's failure to exclude the evidence was harmless. Ray cannot demonstrate substantial prejudice entitling him to reversal.

## B.        *Evidence of Possession of a Firearm in Furtherance of a Drug Trafficking Crime*

Ray claims next that the district court erred in denying his motion for judgment of acquittal with respect to Count Four, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c), because there was insufficient evidence to convict him for the charge.

---

[10]In his brief, Ray also notes that, on direct examination, he "preemptively disclosed" a separate 2005 gun charge and conviction "because the trial court had denied his motions to suppress his record." (Appellant Brief at 25, citing Trial Tr. 3, R. 91, PageID 860, 892, 906, 928, 938). Despite mentioning the 2005 conviction, however, in his appeal Ray only appears to contest the trial court's admission of his 2006 conviction under § 922(g). (*See id*. at 26-27 (presenting argument only about Ray's prior conviction under § 922(g))). Nevertheless, even if we construed Ray's appeal as challenging the admissibility of the 2005 conviction, the Supreme Court has stated that "[g]enerally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755, 120 S. Ct. 1851, 1853, 146 L. Ed. 2d 826 (2000) (*citing* 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 103.14, p. 103-30 (2d ed. 2000) and 1 J. Strong, McCormick on Evidence § 55, p. 246 (5th ed. 1999)). Thus, because the Defense introduced the 2005 conviction during Ray's direct examination testimony, Ray likely waived his right on appeal to assert that the evidence was erroneously admitted.

We review a challenge based on sufficiency of the evidence *de novo. United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). Likewise, we review a defendant's motion for judgment of acquittal *de novo. United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). When reviewing for the sufficiency of evidence in support of a jury verdict, however, we view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences from the testimony. *United States v. Adkins*, 429 F. App'x 471, 475-76 (6th Cir. 2011). Evidence is sufficient to support a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006). When a defendant does not "render his motion for judgment of acquittal for insufficiency of the evidence at the close of all of the proofs, appellate review is limited to determining whether there was a manifest miscarriage of justice." *United States v. Penney*, 576 F.3d 297, 315 (6th Cir. 2009). Here, Ray moved for a judgment of acquittal on the firearms charges under 18 U.S.C. § 924(c) at the close of evidence; therefore, Ray's sufficiency of the evidence claim is properly preserved for appellate review.

A defendant who claims insufficiency of the evidence bears a very heavy burden. *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007). This Court does not "weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Instead, we are "bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *Jackson*, 473 F.3d at 669-70. Indeed, "even circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Hilliard*, 11 F.3d at 620.

Section 924(c) requires that a minimum sentence be imposed on "any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," in addition to the punishment provided for such crime of violence or drug trafficking crime. Ray claims that his possession of the three firearms seized from his residence was not "in furtherance of" a drug trafficking crime.

This Court has explained that the term "in furtherance of," under § 924(c), "should be understood in its ordinary or natural meaning, which ... is a helping forward: advancement,

promotion. In other words, the weapon must promote or facilitate the crime." *United States v. Mackey*, 265 F.3d 457, 460-61 (6th Cir. 2001) (internal citations omitted). Mere "possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *Penney*, 576 F.3d at 315; *see also United States v. Sales*, 247 F. App'x 730, 735-36 (6th Cir. 2007). Instead, the government must "illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity." *Mackey*, 265 F.3d at 461 (where an illegally possessed, loaded, short-barreled shotgun in the living room of the crack house was easily accessible to the defendant and located near scales and razor blades, "a reasonable jury could infer that the purpose of the firearm was to provide defense or deterrence in furtherance of the drug trafficking for which defendant was arrested"). In other words, there must be a "specific nexus between the gun and the crime charged." *Id*. at 462.

We have stated that "factors that may be relevant to a determination of whether the weapon was possessed in furtherance of the crime include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Id*. Further, "[i]n order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use." *Id*.; *see also United States v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004) ("[A] jury can reasonably infer that firearms which are strategically located so as to provide defense or deterrence in furtherance of the drug trafficking are used in furtherance of a drug trafficking crime." (internal quotation omitted)).

Three guns were seized from Ray's residence: a 12-gauge shotgun, a .22 caliber rifle, and a .38 caliber handgun. Ray contends that the Government did not prove that any of the guns were possessed "in furtherance of" drug trafficking. With respect to the 12-gauge shotgun, found behind a door in the southeast bedroom, Ray claims it could not have been possessed "in furtherance of" drug trafficking because it was unloaded.[11] He argues that although the shotgun was found in the same room as marijuana and $148 in cash, the police did not find scales, a

---

[11] In his motion for acquittal before the district court, Ray only disputed that he possessed the guns "in furtherance of" drug trafficking crimes. In his brief, however, Ray again asserts that he did not possess any firearms in furtherance of drug trafficking, but also argues that he was not trafficking marijuana or cocaine. (App. Brief at 33).

police scanner, or other drug paraphernalia. In addition, Ray notes that the Government did not prove that he could load a shotgun quickly, or that he was ever seen with the shotgun. With respect to the loaded .38 caliber handgun, found inside a jacket in his closet near another jacket that contained cocaine, Ray maintains that it was not his; he claims the handgun was left by Maddox, an intoxicated neighbor, after a party. Ray contends that he never sold cocaine and the police had no evidence of him doing so; they only had evidence that an alleged sale of 0.8 grams of marijuana took place from the CI. Ray did not make any specific arguments about the rifle. The Government asserts the "jury had ample evidence before it to find that Ray possessed each of the three firearms" at issue "in furtherance of" drug trafficking because each firearm was easily accessible and strategically located to protect the home and drugs.

In denying Ray's motion for acquittal, the district court concluded that, under *Mackey*, "any reasonable juror could have found that the firearms – any one of the three charged in the indictment – were used 'in furtherance of' a drug trafficking crime." (R. 77, Mem. and Order at 10-12). We agree with the district court's decision only in part.

### 1. *12-gauge Shotgun and .22 Caliber Rifle*

A rational trier of fact could not have found that Ray possessed the 12-gauge shotgun or the .22 caliber rifle "in furtherance of" drug trafficking. With respect to the 12-gauge shotgun, the Government put forth evidence that it was retrieved in the same room (the southeast bedroom) as individual bags of marijuana and $148, that it was illegally possessed because of Ray's status as a felon, that 12-gauge shells were found in the same room as the shotgun, and that shotguns can be loaded quickly. The Government also adduced general evidence that "[m]ost drug dealers keep firearms to protect their drug trade."

Even viewing this evidence in the light most favorable to the prosecution, however, it is insufficient to sustain a conviction under § 924(c): the shotgun was unloaded and propped behind the bedroom door when retrieved. Further, although shotgun shells were found in the same room, they were across the room on a television stand. Thus, the shotgun was not strategically located within reach to protect drugs and, undisputedly, was not prepared for use. We have considered the strategic placement of the gun as a crucial factor in determining whether a gun can be considered to be "advancing or promoting" drug trafficking activity. *See, e.g., Mackey*,

265 F.3d at 462.  The evidence put forward by the Government did not demonstrate a specific nexus between the shotgun and the drug trafficking offenses for which Ray was charged.

With respect to the .22 caliber rifle, the evidence showed that it was retrieved from the top of a closet in the southwest bedroom.  There were no drugs or drug paraphernalia in the room near where the rifle was found.  Although it was loaded and illegally possessed by Ray, because of his prior felony convictions, the Government did not present any other evidence to demonstrate that the rifle had any "specific nexus" to drug activity or that it was possessed to advance or promote drug activity.  The rifle was in a bedroom separate from any illegal narcotics or drug paraphernalia and separate from any other weapons.  Possession of the firearm in the same home as illegal narcotics is insufficient to demonstrate that the weapon was possessed to advance or promote drug trafficking.  *See Penney*, 576 F.3d at 315.  Therefore, no rational juror could have found that the rifle justified finding Ray guilty on Count Four.

### 2.    *.38 Caliber Handgun*

A rational juror could have found, however, that Ray's possession of the .38 caliber semi-automatic handgun was "in furtherance of" drug trafficking, and thus, we sustain his conviction under § 924(c).  The Government presented evidence that the handgun was found in a jacket pocket in the same closet as a separate jacket that contained a plastic bag filled with 49 smaller, individual bags of crack cocaine.  (R. 89 at 669-71).  Officer Robson also testified for the Government that the 49 bags of crack cocaine appeared to be packaged for distribution, and that there was no other indication from the search that crack cocaine was in the home for personal use.  (*Id*. at 671-72).  In addition, Officer Robson testified that when seized, the handgun was loaded with five live rounds in the magazine.  (*Id*. at 672-74).  Further, evidence was presented that the gun was possessed illegally because of Ray's status as a felon.  Additionally, the handgun was discovered during the execution of a search warrant looking for illegal narcotics, which were ultimately found.

"[V]iew[ing] the evidence in the light most favorable to the prosecution and giv[ing] the prosecution the benefit of all reasonable inferences from the testimony," *Caver*, 470 F.3d at 232, a rational juror could find, given the close proximity of the gun to distribution-quantity drugs, that it was strategically located so that it was quickly and easily available for use.  *See Mackey*,

265 F.3d at 461. Further, viewing the Government's evidence in the aggregate, a rational juror could have found that sufficient facts were presented demonstrating a "specific nexus" between the handgun and Ray's drug trafficking offense – namely, that he maintained the handgun in the closet with the crack cocaine to protect himself and his drugs when transacting business. Thus, a reasonable jury could have concluded that Ray possessed the .38 caliber handgun "in furtherance of" drug trafficking. *See, e.g.*, *United States v. Ham*, 628 F.3d 801, 808-09 (6th Cir. 2011) (reasonable trier of fact could have found beyond a reasonable doubt that a loaded pistol on top of armoire just outside of a closet containing crack cocaine in defendant's residence was possessed in furtherance of drug trafficking; it was strategically located and available for use; illegally possessed; discovered during a search warrant looking for drugs, which were ultimately found; and found in close proximity (the same room) as drugs); *Swafford*, 385 F.3d at 1028 (reasonable trier of fact could have found that a loaded semiautomatic pistol was possessed in furtherance of drug trafficking where it was found within arm's reach of where defendant was lying, law enforcement testified that such weapons play a role in drug distribution, the gun was possessed illegally, and was discovered during the execution of a search warrant looking for drugs, which were found); *United States v. Mendizabal*, 214 F. App'x. 496, 501 (6th Cir. 2006) (reasonable trier of fact could have found that a loaded firearm located in a safe alongside cocaine, drugs linked to the conspiracy for which defendant was charged, was positioned to provide protection for the cocaine and thus possessed in furtherance of the defendant's cocaine trafficking conspiracy); *accord Adkins*, 429 F. App'x at 476-78.

### C. Ray's Motion to Suppress Statements Made to the Police

#### 1. Standard of Review

When reviewing the denial of a motion to suppress statements allegedly taken in violation of a defendant's *Miranda* rights, we review the district court's factual findings for clear error and legal conclusions *de novo*. *United States v. Lawrence*, 735 F.3d 385, 436 (6th Cir. 2013) *cert. denied*, 135 S. Ct. 753 (2014); *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010). Factual findings are clearly erroneous only when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). This Court defers to the district court's assessment

of credibility, reviews the evidence in the light most likely to support the district court's decision, and considers the evidence in the light most favorable to the government. *Lawrence*, 735 F.3d at 436 (citing *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999)); *Al-Cholan*, 610 F.3d at 954. Moreover, "[i]n determining the voluntariness of a confession, a reviewing court will not disturb the trial court's findings concerning specific events surrounding the confession unless clear error appears on the record." *United States v. Wrice*, 954 F.2d 406, 410-11 (6th Cir. 1992).

### 2. *Analysis*

Ray asserts that his post-*Miranda* statements made to the police should have been suppressed because of improper pre-*Miranda* questioning at his home, prior to his formal arrest, which he claims led him to make statements under coercion in violation of his Fifth Amendment right against self-incrimination.

### a. *Whether a Waiver of* Miranda *Rights is Voluntary*

The Fifth Amendment to the United States Constitution requires law enforcement officers to advise of certain rights, including the right to have counsel present, before interrogating an individual who has been "taken into custody or otherwise deprived of his freedom." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).[12] A statement made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights "voluntarily, knowingly and intelligently." *Al-Cholan*, 610 F.3d at 954 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). A voluntary waiver is one that is "the product of a free and deliberate choice

---

[12]As a preliminary matter, *Miranda*'s procedural safeguards apply only to suspects subject to a "custodial interrogation." When a suspect is under a custodial interrogation, he must be given notice of his Fifth Amendment privilege against self-incrimination, regardless of whether formal criminal proceedings have begun. *See Miranda*, 384 U.S. at 478-79; *Hoffner v. Bradshaw*, 622 F.3d 487, 511 (6th Cir. 2010). A suspect is "in custody" for *Miranda* purposes if there has been a "formal arrest or restraint on freedom of movement." *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). *See also United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999). Whether a suspect is "in custody" is an objective determination that requires two discrete inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). Both police and courts must "examine all of the circumstances surrounding the interrogation," including those that may affect how a reasonable person in the suspect's position would perceive his freedom to leave. *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994). But the test does not involve consideration of the particular suspect's "actual mindset." *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004).

rather than intimidation, coercion, or deception;" it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The crucial inquiry is not whether the defendant "knew and understood every possible consequence of a waiver," but, instead, "whether he knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Lawrence*, 735 F.3d at 436-37 (*quoting Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009)). To determine whether a waiver is valid, we examine the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 724 (1979).

### b.      Whether a Confession is Involuntary

For a defendant's confession to be involuntary, and therefore obtained in violation of the Fifth Amendment, "coercive police activity" must have preceded the confession. *See Hunter*, 332 F. App'x. at 289; *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). An admission is deemed to be coerced when the law enforcement officials' conduct overbears the accused's will to resist. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

We have established three requirements for "finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). Moreover, determining whether a defendant's statement to police was voluntary requires examining the totality of the circumstances. *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993).[13]

Coercion need not depend upon actual violence by a government agent; a credible threat is sufficient. *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). For instance, "threats to arrest members of a suspect's family may cause a confession to be involuntary." *Finch*, 998 F.2d at 356. Whether a threat to prosecute a third party is coercive

---

[13]Circumstances courts are to consider include "the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given." *Wrice*, 954 F.2d at 411. In deciding whether a defendant's will could have been overborne, courts may also consider whether the defendant had prior experience in the criminal justice system. *Hunter*, 332 F. App'x. at 289; *Ledbetter*, 35 F.3d at 1070.

turns on whether the threat could have been lawfully executed. *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003).[14] The government must prove the voluntariness of the defendant's statement by a preponderance of the evidence. *Mahan*, 190 F.3d at 422.

### c. Continuous Interrogation

The Supreme Court's decisions in *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004), address the admissibility of post-*Miranda* admissions relating to statements made by a defendant prior to receiving *Miranda* warnings.

In *Oregon v. Elstad*, the Supreme Court held that, while "an unwarned admission does not warrant a presumption of compulsion," when the pre-*Miranda* statement is coerced, "the time that passes between the confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310, 314-15 (ultimately finding that, under the circumstances present in the case, the defendant's second confession at the police station was not tainted by the first made at his home).

In *Missouri v. Seibert*, the Court found that suppression of defendant's pre- and post-*Miranda* statements was required where the suspect was *Mirandized* "midstream" after the interrogation had already begun. *Seibert*, 542 U.S. at 614 ("It would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.") (plurality opinion); *id*. at 620-21 (Kennedy, J. concurring). As in *Elstad*, the Court recognized that *Miranda* warnings usually will be ineffective in a successive interrogation that is "close in time and similar in content" to the pre-*Miranda* admission. *Id*. at 613 (plurality opinion); *see also id*. at 622 (Kennedy, J., concurring).

---

[14]In *United States v. Finch*, for example, police officers executing a search warrant at the defendant's residence, where defendant's mother and girlfriend were also present, told the defendant that if the he did not disclose the location of his drugs, the officers would arrest all three of them; the defendant then immediately told the police where the drugs were. *Finch*, 998 F.2d at 355. In reversing the district court's denial of the defendant's motion to suppress, this Court noted the presence of all three *Mahan* factors: the police did not have probable cause to arrest either woman; the interrogation took place in an "inherently oppressive" atmosphere in which the occupants were detained in the residence by five officers; and the defendant's testimony that the officers' threat motivated him to confess was supported by the fact that he confessed immediately after the threat was made. *Id.* at 355-56.

The plurality found that "[t]he threshold issue when interrogators question first and warn later is … whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611-612. The plurality set forth a multi-factor test for determining whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object, including: (1) the completeness and detail involved in the first interrogation; (2) the overlapping content of the pre-and post-*Miranda* statements; (3) the timing and setting of the interrogations; (4) the continuity of police personnel during the two interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615.[15]

Justice Kennedy issued a separate opinion concurring in the judgment but rejecting the plurality's conclusion that a "multi-factor test" should apply whenever a two-stage interrogation occurs. *Id.* at 622 (Kennedy, J., concurring). He proposed an intent-based inquiry, focused on whether the officers *deliberately* employed a two-step interrogation technique designed to undermine the effectiveness of Miranda warnings. If so, any post-warning statement that is related in substance to a pre-warning statement must be suppressed "absent specific, curative steps." *Id.* at 621. If the officers did not deliberately conduct a two-phase interrogation, however, then in Justice Kennedy's judgment *Elstad* should continue to govern the admissibility of any post-warning statement; the question simply would be whether the subsequent confession was voluntary. *Id.* at 622.

### d.     Ray's Arguments

In his motion to suppress before the district court, Ray asserted that his alleged confession was involuntary due to coercion. He claimed that, during the course of the search of his home, an officer advised him that "unless he cooperated and took responsibility, the police would arrest the mother of his son [Cara Lee], resulting in his son being made a ward of the state if both parents were incarcerated." (Mot. to Suppress Confession and Request for Evidentiary Hearing, R. 42, PageID 172). Ray then stated that "shortly thereafter," the officer told him that they were "off the record" and questioned him about whether he sold "weed," and whether he

---

[15]*See also United States v. Ashmore*, No. 13-5593, 2015 WL 1963587, at *8-12 (6th Cir. May 1, 2015) (discussing the Supreme Court's jurisprudence on this issue); *United States v. Miller*, 562 F. App'x 272, 286-87 (6th Cir. 2014) (same).

owned the guns found in the home. (*Id*.). Ray asserted that he then admitted to selling marijuana and to ownership of the shotgun, "believing that the mother of his child was in danger of being arrested." (*Id*.). In fact, Cara Lee, Ray's long-term girlfriend and the mother of his child, was not arrested following the search of the home or subsequently; it is undisputed that she was not charged with any crimes related to the search of 9241 Genessee Street.

In testimony at trial, Ray reiterated and elaborated upon the facts asserted in his motion to suppress: he testified that during the police raid, he and Lee both were handcuffed and placed in the front room while the evidence was processed. (R. 91 at 948-49). While in the living room, he testified that Officer Hill, who passed away prior to trial, threatened that Lee would be arrested along with Ray. (*Id*. at 957-59). Ray testified that he claimed responsibility for the shotgun and the marijuana in order to spare Lee and for the sake of their son. The testifying officers denied any conversation with Ray at the home about guns and drugs. (R. 89 at 678, 717-18). Ultimately, they did not arrest Lee.

Ray's statements made at the police station took place a mere hour and a half later. Officer Hill and Officer Robson, the same officers who were involved in the raid at his house, questioned him, gave him the *Miranda* waiver form, and took his statement. (R. 89 at 680-97). Ray repeated the same representations he made at the house: that the shotgun belonged to him and that he sold marijuana. (*Id*. at 692-93). Thus, Ray argues on appeal that, under *Seibert*, his pre-*Miranda* admission tainted his post-*Miranda* admission and therefore his post-*Miranda* statement should have been suppressed as a matter of law. (*Id*.).

### 2.          *The Trial Court's Order and Application of Law*

The district court denied Ray's motion to suppress, finding that his claims failed as a matter of law, without an evidentiary hearing, finding that such a hearing would only serve as "unnecessary delay." (R. 45 at 210). In its order, the district court determined that, even if Ray was told at his home "that his child's mother would be arrested if he did not cooperate," his confession at the police station took place after he was *Mirandized*. (*Id*. at 209). Further, the trial court found that it was "equally plausible that Ray confessed at the station, after being *Mirandized*, because he knew he had been caught after drugs and firearms were seized from his home during the search," as opposed to confessing because of any alleged coercion. (*Id*. at 209-

10) (citing *United States v. Hunter*, 332 F. App'x 285 (6th Cir. 2009) (holding that the district court's finding that an allegedly coercive threat did not specifically motivate the defendant's confession where: (1) there was no evidence that the threat was repeated at the police station; (2) defendant offered no admissible evidence that the threat was the crucial factor motivating his confession; and (3) he confessed immediately after the officer threatened to administer a gun residue test, as opposed to confessing immediately after the allegedly coercive threat was made, thus "the gun-residue test was just as plausible a motivating factor" for the confession as was the threat).

The district court did not consider *Seibert* in concluding that Ray's statement made at the police station could be admitted against him. In fact, the trial court's order did not include any discussion of whether the pre-*Miranda* statements (which it assumed were made after Ray was threatened with Lee's arrest) tainted the post-*Miranda* confession. (*Id*.). The district court only conducted a coercion analysis under *Mahan* and *Hunter* and concluded, with minimal examination and, notably, without any determination that Ray's *Miranda* waiver was signed knowingly, voluntarily, and intelligently, that Ray's *Miranda* waiver trumped any argument he could make. (*Id*.). That was error.

Further, although the trial court found that the Government "met its burden in proving by a preponderance of the evidence that the confession was in fact voluntary," in fact, the Government's response to Ray's motion to suppress did not address the law under *Elstad* or *Seibert*. (*See generally* R. 44) Thus, the Government's request for admission of Ray's post-*Miranda* statements was granted even though the Government had not made an evidentiary showing under *Seibert* that admission was appropriate. That, too, was error. *See Seibert*, 542 U.S. at 608 n.1 ("[T]he burden of showing admissibility rests, of course, on the prosecution. The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, and the voluntariness of the confession." (alteration in original) (citations and internal quotation marks omitted)).

We remand this issue to the district court to conduct a full evidentiary hearing on Ray's motion to suppress. We further direct the district court to apply legal standards set out by the

Supreme Court under a more fully developed factual record, to determine whether Ray's post-*Miranda* statements should be admitted under *Elstad*, *Seibert*, and their progeny.

### 3.      *The Test to be Applied on Remand*

Because no single opinion spoke for the majority of the Court in *Seibert*, we must attempt to discern what the decision requires in order to provide the district court with guidance on what test to apply on remand.

Generally, when there is no majority opinion, the narrowest opinion adhered to by at least five Justices controls.  *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]" (internal quotation marks omitted)).  The *Marks* rule is not workable, however, when a concurrence that provides the fifth crucial vote does not provide an "opinion that can be meaningfully regarded as 'narrower' than another" or does not "'represent a common denominator of the Court's reasoning.'"  *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3d Cir. 1999) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc)); *see also, e.g.*, *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) ("Where no standard put forth in a concurring opinion is a logical subset of another concurring opinion (or opinions) that, together, would equal five votes, *Marks* breaks down."); *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) ("When, however, a concurrence that provides the fifth vote necessary to reach a majority does not provide a 'common denominator' for the judgment, the *Marks* rule does not help resolve the ultimate question."); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (10th Cir. 2006) ("When the plurality and concurring opinions take distinct approaches, and there is no narrowest opinion representing the common denominator of the Court's reasoning, then *Marks* becomes problematic. We do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive.").

As we have previously recognized, in interpreting *Seibert*, our sister circuits disagree as to whether the plurality opinion or Justice Kennedy's concurrence controls.  *See United States v. Wooten*, 602 F. App'x 267, 272 (6th Cir. 2015).  In *United States v. Rodriquez-Preciado*,

399 F.3d 1118 (9th Cir. 2005), Judge Berzon's dissent details *Seibert*'s opinions and persuasively explains why Justice Kennedy's intent-based test is not the narrowest ground on which the Court agreed and, therefore, why *Marks* is not workable here. She states:

> Justice Kennedy concurred in *Seibert* on a ground arguably narrower than that relied upon by the plurality. He stated that deliberateness on the part of the police—or the lack thereof—should guide the inquiry, not the objective effectiveness factors outlined in Justice Souter's plurality opinion. But three of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police.[12] In dissent, Justice O'Connor, joined by the Chief Justice and Justices Scalia and Thomas, repeatedly agreed with the plurality that the subjective intent of the interrogator cannot control. *See, e.g., Seibert*, [124 S.Ct. at 2616] (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."); *id.* at 2617 ("The plurality's rejection of an intent-based test is also, in my view, correct."); *id.* ("Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which suspects experience interrogation.... Thoughts kept inside a police officer's head cannot affect that experience."); *id.* at 2618 ("[R]ecognizing an exception to *Elstad* for intentional violations would require focusing constitutional analysis on a police officer's subjective intent, an unattractive proposition that we all but uniformly avoid."). Most definitive is Justice O'Connor's statement at the end of Part I of her dissent: "[T]he approach espoused by Justice KENNEDY is ill advised.... This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect." *Id.* at 2618-19.
>
> **FN12.** Arguably, Justice Breyer's concurring opinion, though he fully concurred in (and joined) Justice Souter's opinion for the plurality, differs from the plurality on the deliberateness point. *See, e.g., Seibert*, [124 S.Ct. at 2614] (Breyer, J., concurring) (joining Justice Kennedy's opinion "insofar as it ... makes clear that a good-faith exception applies"). Accepting this position for the sake of argument, the tally is seven to two against the subjective-intent-of-the-interrogator position.
>
> The dissenters went on to disagree with the plurality over the force of *Elstad:* The plurality, along with Justice Kennedy, favored creating an exception to *Elstad*, although the opinions differed fundamentally as to the nature of the exception. The dissent, in contrast, took issue with the extent to which the plurality "devour[ed]" *Elstad. Id.* at 2616. Under *Elstad*, the dissent suggested, "if [the defendant's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances...." *Id.* at 2619. In so maintaining, however, the dissent also necessarily disagreed with the plurality that the relevant standard should be the objective effectiveness of the warnings. Instead, Justice O'Connor suggested that

question-first interrogations should be analyzed "under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad.*" *Id.*

This analysis of the *Seibert* opinions indicates that while Justice Kennedy's was the crucial fifth vote for the result, and for the proposition that *Elstad* does not strictly govern cases with midstream *Miranda* warnings, Justice Kennedy's opinion is *not* the narrowest opinion embodying a position supported by at least five Justices in the majority. It embodies a position supported by two Justices, at most.

*Rodriguez-Preciado*, 399 F.3d at 1138-40 (footnotes and citations omitted) (emphasis added) (Berzon, J., dissenting); *see also Com. v. Charleston*, 2011 PA Super 32, 16 A.3d 505, 522-24 (2011) (citing the *Rodriguez-Preciado* dissent with support and reaching the same conclusion); *Heron*, 564 F.3d at 85 (same). We agree with and adopt Judge Berzon's reasoning here.

Because we are left with a situation where the plurality and dissent each received only four votes, we conclude that *Seibert* did not announce a binding rule of law with respect to the admissibility standard for statements given subsequent to midstream *Miranda* warnings. *See Heron*, 564 F.3d at 885; *Com.*, 16 A.3d at 525; *Rodriguez-Preciado* 399 F.3d at 1141 (Berzon, J., dissenting); *see also Anker Energy Corp.*, 177 F.3d at 170 ("[I]n cases where approaches differ, no particular standard is binding on an inferior court because no one has received the support of a majority of the Supreme Court.").

The question remains, then: what test should be applied? Until now, the Sixth Circuit has not settled on a definitive approach to the problem addressed in *Seibert*. Rather, we have been able to avoid the question by finding that the outcomes in the cases before us would be the same under either the plurality's or Justice Kennedy's framework. *See, e.g.*, *Wooten*, 602 F. App'x at 272 ("In addition, this circuit and the First Circuit have avoided ruling on the issue in cases in which the outcome would be the same under either framework. . . we conclude that the same resolution is appropriate here."); *United States v. McConer*, 530 F.3d 484, 497-98 (6th Cir. 2008) (ruling that "neither the plurality nor the concurrence in *Seibert* supports [defendant's] *Miranda* argument"); *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008) (holding that "regardless of the applicable framework [defendant's] statement must be suppressed"); *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009) ("As the next section demonstrates,

jurisdiction is proper here under both Justice Kennedy's and the plurality's tests, so we leave ultimate resolution . . . to a future case that turns on which test in-fact controls.").

We resolve this open question today by adopting the multi-factor test announced by the *Seibert* plurality. Various circuits have adopted decisions of Supreme Court pluralities as the law of the circuit. *See United States v. Hearst*, 563 F.2d 1331, 1345 n.10 (9th Cir. 1977) (following as "persuasive" the Supreme Court's plurality opinion in *Lanza v. New York*, 370 U.S. 139 (1962)); *Kirsch v. Plovidba*, 971 F.2d 1026, 1028-29 (3d Cir. 1992) (adopting the three-Justice plurality in *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156 (1981), as the law of the circuit).

Further, we recognize the traditional focus in criminal procedure on the reasonable belief of a defendant in Constitutional jurisprudence and that the Supreme Court has previously rejected intent-based tests in various criminal procedure contexts, as noted by Justice O'Connor in her dissent in *Seibert*. *See* 542 U.S. at 625 (O'Connor, J., dissenting). This further convinces us of the prudence of rejecting Justice Kennedy's subjective intent-based test, which focuses on the intent of the interrogating officer instead of on the reasonable belief of the defendant, and accepting the plurality's multi-factor test as controlling precedent in this Circuit.

Therefore, we adopt *Seibert* plurality's multi-factor test for this Circuit and direct the district court to apply this test on remand. Under the multi-factor test, the admissibility of statements given after midstream *Miranda* warnings hinges on whether "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Seibert*, 542 U.S. at 616 (plurality opinion). The factors identified by the plurality as relevant to this inquiry are "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*.

**D.** ***Denial of Discovery Motion Requesting Information Related to the Police's Confidential Informant***

Ray next contends that the district court erred by denying his request to order the Government to disclose the identity of, and information about, the CI whose participation in a "controlled buy" and subsequent statements to the police formed the basis for the search warrant supporting the search of 9241 Genessee Street. We review the district court's denial of discovery motions for abuse of discretion. *See United States v. Seymour*, 739 F.3d 923, 927 (6th Cir. 2014); *United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993). Likewise, a district court's decision to deny a motion to disclose the identity of a confidential informant is reviewed for abuse of discretion. *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact. *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005) (citation and internal punctuation omitted).

In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court recognized that the government has a limited privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," often called "the informer's privilege." *Id.* at 59. This privilege is limited, however, by "the fundamental requirements of fairness." *Id.* at 60. When "disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. To determine whether an informer's identity should be disclosed, *Roviaro* requires balancing "the public interest in protecting the flow of information" against an "individual's right to prepare his defense." *Id.* at 62. Whether this balancing renders nondisclosure erroneous depends on the particular circumstances of each case, including consideration of the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Id.*; *see also United States v. Beals*, 698 F.3d 248, 269-70 (6th Cir. 2012); *Sales*, 247 F. App'x at 734-35 (6th Cir. 2007) ("To invoke the [informer's] privilege, the public interest in protecting the flow of information to the government must outweigh the defendant's need for disclosure of information in the preparation of a defense.") (*quoting United States v. Straughter*, 950 F.2d 1223, 1232 (6th Cir. 1991)).

Generally, the *Roviaro* balancing test is left to the district court's discretion.  *United States v. Sharp*, 778 F .2d 1182, 1187 (6th Cir. 1985).  Further, "[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *Roviaro*, 353 U.S. at 62 (citation omitted).  A defendant must provide some evidence that disclosure of the informant's identity would assist in his defense before disclosure will be warranted.  *Id*.; *see also, e.g.*, *Moore*, 954 F.2d at 381 (affirming district court's refusal to compel disclosure of informant where defendant "advanced no more than a simple statement that [informant's] testimony might assist in his defense," stating that "[a]n informant must be disclosed only upon a showing by the defendant that disclosure is essential to a fair trial"); *Sharp*, 778 F.2d at 1187 (holding that trial court abused its discretion in ordering disclosure of informant's identity based solely on defense counsel's unsworn representations that disclosure would be relevant and helpful to his defense).

The district court was within its discretion to allow the Government to withhold the identity of its CI.  In Ray's motion, he failed to demonstrate how disclosure of information about the CI would "substantively assist his defense" or that disclosure was "essential to a fair trial." *Moore*, 954 F.2d at 381; *United States v. Sales*, 247 F. App'x 730, 734 (6th Cir. 2007).  Instead, he merely argued that the CI "was the person that formed the facts for the issuance of the search warrant," and so "[i]n order to present any viable defense," the requested information was necessary.  (Mot. for Discovery, R. 40, PageID 164).  Further, on appeal, Ray has not demonstrated to this Court how disclosure would have assisted him at trial; he only asserts that the CI could have testified at trial about the details of the alleged purchase during the controlled buy, even though Ray was never charged for that alleged sale.

The only record evidence of the role played by the CI in this case is that the CI supplied the information to law enforcement that ultimately led to a fruitful search.  *See Beals*, 698 F.3d 248, 270 (6th Cir. 2012) (holding that the district court was within its discretion not to order disclosure of the government's confidential informant where the informant only "helped orchestrate the search that led to discovery of incriminating evidence, not the crimes themselves," and "could not testify to any relevant fact.").  Similar to *Beals*, in this case, Ray was not charged with any crimes related to the controlled buy, thus the CI was not involved in,

and could not testify about, the crimes for which Ray was charged and could not have provided testimony to any fact relevant to those charges. Ray's arguments for discovery of information related to the CI pertained to the legality of the search of his home, a matter which had been ruled upon during the *Franks* hearing.

While it is conceivable that Ray could have argued successfully that information related to the CI would have been helpful to his defense against the crimes for which he was charged and essential to a fair trial, despite the fact that he was not charged with facts related to the controlled buy, he did not do so here. Thus, we cannot say that the trial court abused its discretion in denying Ray's motion requesting disclosure of the identity of, and information about, the CI in this case.

### E.    *Motion to Suppress Evidence Seized from Home*

In his next issue on appeal, Ray maintains that the district court erred by denying his motion to suppress the evidence seized when the officers searched his home, arguing that no probable cause supported the search warrant because the statements made in the warrant affidavit were untrue. Therefore, Ray argues that the district court erred in failing to suppress the evidence seized at his residence on August 23, 2012, pursuant to the search warrant.

When reviewing the denial of a motion to suppress evidence, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). A factual finding is clearly erroneous when "a court, on reviewing the evidence, is left with the definite and firm conviction that a mistake has been committed." *Id*. The reviewing court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id*. The district court's finding that there was probable cause to support the warrant is reviewed *de novo*. *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009). Moreover, in reviewing the denial of a motion to suppress, this Court reviews all evidence in the light most favorable to the government." *Gunter*, 551 F.3d at 479.

The Fourth Amendment ensures that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. To satisfy the Fourth

Amendment's warrant requirement, a magistrate issuing a warrant must be satisfied that probable cause exists for a search. *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) ("[When] an affidavit is the basis for a probable cause determination, that affidavit 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" (citation omitted)). Probable cause exists if there are "'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Moreover, a "[r]eview of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *Id.* at 892.

To issue a warrant, a judicial officer must "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gunter*, 551 F.3d at 479. We also have stated, however, that "independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause." *Id.* at 307. So long as the issuing judge can conclude independently that the information is reliable, an affidavit based on the informant's tip will support a finding of probable cause. *Coffee*, 434 F.3d at 893. Absent any indicia of an informant's reliability, courts insist that the affidavit contain "substantial independent police corroboration." *Jackson*, 470 F.3d at 307. In summary, an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information. *Coffee*, 434 F.3d at 893.

This Court has found that:

[A]n affidavit contained sufficient corroborating information when 'the details of the controlled purchase, and its connection to [the place to be searched], were spelled out in the affidavit." [*Coffee*, 434 F.3d] at 894. An affidavit in which the affiant "described the controlled purchase that [the affiant] organized to corroborate the informant's information ... [which] was controlled and witnessed by [the affiant], who searched the [informant] for money or contraband, provided the [informant] with pre-recorded funds, observed the [informant] enter and exit defendant's house, and then observed and tested the [contraband] the [informant] purchased from defendant," *id.*, included sufficient corroborating information to

support probable cause. Similarly, this Court has found that an affidavit that "contained [the affiant's] personal observation, his pat down of the informant before and after the purchase of the narcotics, and the fact that the drugs purchased by the confidential informant were later tested positive for [contraband]," *United States v. Pinson*, 321 F.3d 558, 563 (6th Cir.2003), stated sufficient facts from which a magistrate judge could determine that probable cause existed.

*Adkins*, 429 F. App'x at 479; *see also Sales*, 247 F. App'x at 733-34 (the "independent corroboration" of the CI's testimony by the officer who worked with the CI to facilitate the controlled buy "provided sufficient probable cause for the issuance of the search warrant," even where the affidavit contained no facts supporting the CI's reliability); *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006) (the officer's "corroboration of events that occurred during the controlled buy, as set forth in the affidavit, provide sufficient probable cause to sustain issuance of the search warrant").

Here, in the warrant affidavit at issue, Officer Yopp attested to the following: (1) that he is a member of DPD's Narcotics Enforcement Section East, assigned to investigate narcotic trafficking in Detroit; (2) that he worked with a CI who had been used on several prior occasions and who, based on past experience, was known to be credible and reliable; (3) that DPD received narcotic complaints about the subject home; (4) that, on August 22, 2012, he met with the CI and had the CI make a controlled purchase of narcotics at the home; and (5) that he has participated in numerous raids in Detroit, and it is common for firearms and/or weapons to be found during such raids. (Mem. and Order Denying Def. Mot. to Suppress Evidence at 3-4).

Below, Ray filed a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), challenging the affidavit supporting the warrant that authorized the search of his home. (R. 23, *Franks* Motion, PageID 36-44). The district court granted Ray's request for a *Franks* hearing. At the hearing, the Government called the affiant, Officer Yopp and DPD Sergeant Jason Sloan. Officer Yopp testified that he received narcotics complaints about drug dealing at the address of 9241 Genessee Street. He could not, however, recall any specific complaints that were allegedly received, whether they were made to him or whether he learned of them through another officer, and he testified that none of the complaints was recorded or otherwise memorialized. (*Id*. at 113, 123-25).

Defense counsel argued that the affidavit was insufficient to establish probable cause because Yopp was untruthful in the affidavit when he averred that he received complaints about narcotics being sold at Ray's home prior to August 23, 2012. Further, the Defense insisted that Ray in fact did not sell marijuana to the CI on August 22, 2012. According to Defense counsel, the Defense hired an investigator who could not uncover any "complaints" regarding the subject home. (*Id*. at 101-102). At the hearing, however, the Defense did not call the investigator or any other witnesses. The only evidence Ray proffered was his own affidavit asserting his belief that the controlled buy did not happen. (R. 31, Mem. and Order, at 2; R. 23-2, *Affidavit*, PageID 46).

The court was not persuaded by Ray's evidence or arguments, finding: (1) that Ray did not proffer any evidence that Yopp lied about DPD receiving complaints; (2) even if Yopp lied about the complaints, the remaining information in the affidavit was sufficient to establish probable cause; (3) Ray's own affidavit denying that he sold marijuana to the CI had "no evidentiary value" and therefore Ray did not proffer evidence contesting the affidavit's representation that Ray sold marijuana to the CI on August 22, 2012. (*Id*.). Thus, the trial court denied Ray's request to suppress the evidence—specifically, the cocaine, marijuana, and firearms—discovered during the execution of the warrant, (R. 31, Order Denying Frank's Mtn., PageID 88), finding that the Government established by a preponderance of the evidence that the evidence was admissible.

Like the affidavits at issue in *Coffee*, *Pinson*, *Sales*, and *Jackson*, the affidavit supporting the search warrant in this case included Officer Yopp's testimony that he orchestrated the controlled buy, witnessed the CI at the door of 9241 Genessee Street (although he could not see with whom the CI interacted), searched the CI beforehand, and provided the CI with funds for the transaction. Further, Officer Yopp also averred that he had previously worked with the CI and the CI was known to be credible and reliable. Certainly the police officer's corroboration would be stronger if Officer Yopp received the initial information about the possible sale of narcotics at 9241 Genessee Street from the CI, personally saw the person with whom the CI interacted during the controlled buy, and had pre-recorded the funds he gave to the CI for the purchase, factors that were also present in *Coffee*. Officer Yopp's first-hand observations, circumstantially linked to Ray's residence, provide a "sufficient basis" for a magistrate judge to

conclude that there was "a fair probability that contraband or evidence of a crime [would] be found in [Defendant's residence]." *Adkins*, 429 F. App'x at 781 (citing *Jackson*, 470 F.3d at 306). Therefore, the district court did not err in denying Ray's motion to suppress evidence seized pursuant to the August 22, 2012 search warrant.

### F.      Trial Court's Response to the Jury's Inquiry Regarding the Meaning of "In Furtherance of" as it Related to the Elements of Count Four

Ray next objects to the trial court's response to a jury question, instructing the jurors on the meaning of "in furtherance of" as it relates to the elements under 18 U.S.C. § 924(c), the statute Ray was charged with violating in Count Four. Generally, we review properly preserved errors in jury instructions for abuse of discretion.[16] *United States v. Douglas*, 371 F. App'x 562, 565 (6th Cir. 2010); *United States v. Carson*, 560 F.3d 566, 578 (6th Cir. 2009). In this case, however, Ray failed to make a proper objection at trial to the district court's jury instruction on the meaning of "in furtherance of" or to the district court's response to the jury's question about the meaning of "advance and promote" as used to define the phrase "in furtherance of." (*See generally* R. 92, Tr. Jury Trial, Vol. 4, May 23, 2014, PageID 989-1075). For that reason, we will not reverse Ray's conviction on this basis unless the instructions amounted to plain error. *See* Fed. R. Crim. P. 30(d) & 52(b); *United States v. Douglas*, 371 F. App'x 562, 565 (6th Cir. 2010) (citing *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006)).[17] "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Newsom*, 452 F.3d at 605 (internal quotation marks, citation, and alteration omitted).

Where there is evidence that the jury is confused over a central legal issue not covered by the original jury instructions, "a district court abuses its discretion by not clarifying the issue." *United States v. Nunez*, 889 F.2d 1564, 1567-69 (6th Cir. 1989) (holding that the district court was required to give a supplemental jury instruction where the original instructions did not address whether there could be a conspiracy comprised of a single defendant and an undercover

---

[16]Likewise, a district court's "response to jury questions is reviewed under the abuse-of-discretion standard." *United States v. Fisher*, 648 F.3d 442, 446-47 (6th Cir. 2011).

[17]Regardless, under either the plain error or abuse of discretion standard of review, the challenged jury instruction and trial court's response to the jury's question about that instruction did not constitute reversible error.

officer, a legal issue that was key to the jury's deliberations).  "A district court, however, should refrain from straying beyond the purpose of jury instructions by answering jury questions that seek collateral or inappropriate advice."  *United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994) (discussing generally a district court's duties with regard to supplemental jury instructions); *see also Fisher*, 648 F.3d at 446-47.

In this case, the jury initially was given the following instruction regarding the meaning of "in furtherance of" as used in § 924(c): "[T]he term 'in furtherance of' means that the firearm was possessed to advance or promote the crime charged in Count Two or Count Three, or both, and that the firearm was strategically located so that it was quickly and easily available for use." (R.77, Mem. and Order, PageID 393).  After the jury began deliberations, the district court received the following inquiry from the foreperson:  "On page 31 of your packet the words 'advance and promote' are used in the first paragraph.  Is there any additional information you can give in defining both of these terms that relates to this case?"  (*Id*. at 394).  After consulting the Sixth Circuit Pattern Jury Instructions and counsel for both parties, the court responded:

> Okay.  I think the words, to me, "advance and promote" are sufficient.  They are words of ordinary and common usage and they have their ordinary and common meaning, but I'll try and help you a little bit.
>
> Mere possession is not sufficient.  There must be a connection between the firearm and the drugs which are the subject matter of the drug offense.  For example, the firearm, you should consider whether or not it is strategically located so that it is quickly and easily available for use.
>
> Again, other factors may be relevant to a determination of whether the weapon was possessed in furtherance of the crime, including, for example, whether the firearm was loaded, the type of firearm, the legality of its possession, the type of drug activity being conducted, and the time and circumstances under which the firearm was found.
>
> So those are the things you think about as you deliberate and come to a conclusion.  If you have another note, let me know.  Thank you.

(*Id*.  *See also* R. 92 at 1065-68).

Ray claims that he asked the district court simply to refer the jury to the court's earlier instruction using "advance or promote" to define "in furtherance of."  (Appellant Brief at 47). "By deviating from the standard jury instruction," Ray now argues, "the court unnecessarily

confused and muddled the definitions and explanations that the jury was seeking." (*Id*. at 48). In response, the Government argues that the original instruction given to the jury mirrors Sixth Circuit Pattern Instruction 12.03(2)(D), and that the district court's response to the jurors' question articulates an accurate statement of the law under *Mackey*. (Appellee Brief at 37-39).

We find that the district court's response to the jury's question regarding the meaning of the phrase "advance and promote," as used in the original jury instructions to define the term "in furtherance of" under 18 U.S.C. § 924(c), did not amount to plain error. The district court's response quotes *Mackey*, which delineates when a firearm is possessed "in furtherance of" drug trafficking.[18]  Indeed, the same portion of *Mackey* used by the trial court is quoted in the Committee Commentary to Sixth Circuit Pattern Instruction § 12.03 as additional language defining "in furtherance of." *See* Sixth Circuit Criminal Pattern Jury Instructions Committee Commentary to § 12.03. Under these circumstances, Ray has not shown that either the original jury instruction or the district court's response to the jury's question was "so clearly erroneous as to likely produce a grave miscarriage of justice." *See Douglas*, 371 F. App'x at 565; *Newsom*, 452 F.3d at 605.

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** and **REMAND** for an evidentiary hearing on whether Ray's statements can be properly admitted under a *Seibert* analysis, in accordance with this Opinion. We **AFFIRM** on all other issues.

---

[18]*See discussion*, Part B, *supra.*