**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0483n.06
Filed: August 12, 2008

No. 06-2034

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United |
| | ) | States District Court for the |
| EUGENE ATKINS II, | ) | Western District of Michigan |
| | ) | |
| Defendant-Appellant. | ) | |

Before:      BOGGS; Chief Judge; and MOORE and CLAY, Circuit Judges.

BOGGS, Chief Judge.   When seventeen-year-old Matthew McKinney died from an accidental heroin overdose, police traced the heroin to Eugene Atkins.  Atkins was then on felony probation for distributing cocaine.  A jury convicted Atkins of, among other crimes, knowingly distributing a controlled substance (heroin) that resulted in death from the use of such substance, in violation of 21 U.S.C. § 841(b)(1)(C).  On appeal, Atkins argues that the district court should have instructed the jury that another heroin addict's failure to seek medical attention when McKinney passed out was a superseding cause that relieved Atkins of criminal liability.  We hold that the district court did not commit plain error in failing to give such an instruction *sua sponte* when six other courts of appeal have held that the statute does not require proof of proximate cause or proof that the death was foreseeable.  We also reject Atkins's sufficiency-of-the-evidence argument, and we therefore AFFIRM.

I

On December 28, 2004, a grand jury indicted Eugene Atkins on one count of possession of heroin with the intent to distribute. The grand jury issued three superseding indictments, which added counts for distributing heroin that resulted in "death from the use of the heroin," conspiracy to distribute heroin involving 100 grams or more, and two counts of distribution of heroin to a person under the age of 21. Atkins pleaded guilty to count one of the third superseding indictment on November 17, 2005, but later withdrew the plea and the case proceeded to trial. On March 13, the government filed an Information establishing Atkins's prior felony conviction for selling cocaine. Atkins's jury trial began on April 3, 2006.

At trial, the government presented evidence that a group of high school students and recent high school graduates in the Grand Rapids area began experimenting with marijuana, moved to abusing Oxycotin, and, tragically, ended up addicted to heroin. Ten of these addicts testified. All identified Atkins, whom they knew as "Austin," as their source and said that they bought heroin from him in the Eastown area of Grand Rapids. At least three of these addicts also testified that Atkins occasionally sent another person, known to them as "Pat" or "Webster," to deliver the heroin. An agent from the Drug Enforcement Agency testified that the police later identified Ryan Moss as "Pat."[1]

The government introduced into evidence a cell phone they found on Atkins's person when they arrested him. This phone was registered to Tiffany Price, the mother of Atkins's child.

---

[1] Moss's status as a juvenile kept him safe from federal prosecution, but in November 2005, state police arrested him for assault with intent to murder.

Records from this phone showed an unusually high number of phone calls and of Nextel "Direct Connect" communications between Atkins and the various addicts between October 10 and December 17, 2004 (including 75 communications with one of the addicts alone).

McKinney's companion and fellow addict, Christopher Perrin, then testified that he picked up McKinney at McKinney's home around 8:00 p.m. on December 14, 2004, so they could go buy heroin. They drove across town, and during that time Perrin called Atkins several times to set up the deal. They arranged to meet in Eastown at the corner of Logan and Ethel streets. Perrin parked his car, and then got out to see if something was dragging underneath. Perrin's testimony then proceeded as follows:

Q:      So, how long after you pulled up was he at your car on Logan and Ethel?

A:      Within, you know, ten seconds.

Q:      And what occurred at that time?

A:      I leaned down and checked the car and he was doing the transaction.

Q:      And did he give you or Matt the drugs?

A:      He gave Matt the dope.

Q:      And who paid him?

A:      Matt did.

After making the buy, McKinney tried unsuccessfully to inject himself. Perrin then helped McKinney inject the heroin. Soon after taking the heroin, McKinney passed out.

Cell phone records show that the sale took place about 9:45 p.m. Specifically, the records show that Perrin called Atkins at 8:47, 9:12, and 9:27. Atkins called Perrin at 9:27. Perrin then

called Atkins at 9:41 and again at 9:42. Finally, Atkins called Perrin at 9:43. During this time, the phone records show that Perrin's phone moved from the west side of Grand Rapids toward the east side where Atkins was located.

Perrin stated that he was not worried when McKinney passed out because "[e]veryone that's ever done heroin has passed out at one time or another," and McKinney had passed out before for two or three hours. Perrin demonstrated his lack of worry by driving to a Meijer to buy pop and cigarettes, calling his girlfriend, and then driving to his mother's house. Perrin finally tried to take McKinney home, but parked down the street to avoid McKinney's mother. Perrin saw that the back sliding door to McKinney's house was unlocked, but did not bring McKinney inside because he could not awaken or move the passed-out McKinney.

From there, Perrin drove to his grandmother's house, where he used heroin and called his girlfriend again. Phone records show that Perrin stopped talking to his girlfriend at 1:58 a.m. Perrin then drove back to his mother's house, and when he got there, he lied to his mother and said that McKinney was passed out from being drunk. Perrin and his mother covered McKinney with blankets and left him in the car overnight. Before going to bed at 4:00 a.m., Perrin checked McKinney and saw that he was "snoring loud." At 6:00 a.m., Perrin's mother's boyfriend found McKinney dead in the car. A toxicologist tested McKinney's body and determined that McKinney died from a heroin overdose.

Perrin admitted to the jury that he spoke with police three times the day McKinney died, and that he did not tell the police the full truth until the third time. He also acknowledged that he had

pleaded guilty to misprision of a felony for misleading the officers,[2] and admitted his own moral culpability for McKinney's death through his failure to seek medical help. The government produced Perrin's plea agreement, in which Perrin was promised a reduced sentence if he testified accurately. On cross-examination, Perrin acknowledged that in late 2004 he ran into Ryan Moss, aka "Pat," in the local jail, where Moss told Perrin that Moss's name better not come up at trial.

Police officers explained that after McKinney's death, they began talking to known heroin addicts in an attempt to track down the supplier. Addict Charles Helder agreed to cooperate in the investigation and made taped phone calls to "Austin" (Atkins) in which he asked for more heroin. Officers then convinced another addict, Ross Poel, to help them set up a sting. On December 17, 2004, Poel called "Austin" about buying heroin. This call was taped and played to the jury. "Austin" told Poel to meet him at the corner of Logan and Ethel—the same corner where Perrin testified that Atkins sold the heroin to McKinney three days earlier.

The police then staked out the intersection. Poel called Atkins again when Poel reached the intersection, and as the call was taking place, police saw Atkins walking toward the intersection. Atkins saw the police, tossed something from his pocket, and started running. Officers chased and tackled Atkins. Another officer located the two bags that Atkins threw from his pockets. The bags contained heroin. Police also searched Atkins's room at his girlfriend's apartment and found a digital scale. Atkins did not testify.

---

[2] Perrin was sentenced two years of imprisonment for this crime on March 17, 2006.

On April 10, 2003, a jury convicted him on all five counts. The base offense level for a conviction under 21 U.S.C. § 841 (b)(1)(C) for distributing an illegal drug that results in death is 43 if the defendant has been convicted previously for selling illegal drugs. U.S.S.G. § 2D1.1(a)(1). Thus, Atkins's base offense level for count 1 was 43. Pursuant to § 3D1.2, all five counts were grouped together, and pursuant to § 3D1.3, the base offense level of 43 was applied to all five counts. The PSR added 2 levels for obstruction of justice, but this addition was irrelevant because 43 is the highest offense level under the Guidelines. Atkins had a Criminal History Category of III, and, combined with his offense level of 43, his Guidelines range was life in prison. On July 19, 2006, Judge Bell sentenced Atkins to life on count 1 (distribution resulting in death) and count 3 (conspiracy to distribute heroin) and to 360 months of imprisonment on the other three counts. Atkins appealed.

## II

### A

Atkins contends that § 841(b)(1)(C) requires proof of proximate cause, further argues that Perrin's failure to seek medical attention was a superseding cause that cut off Atkins's criminal liability for McKinney's death, and concludes that the district court should therefore have given a superseding cause instruction to the jury. Atkins admits that he faces plain error review because he did not ask for a superseding cause instruction below. Proving plain error requires proving: "(1) there was an error; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Wheaton*, 517 F.3d 350, 362 (6th Cir. 2008) (internal citations

omitted). Jury instructions (or the lack of them) do not constitute plain error unless "taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006) (quoting *United States v. Combs*, 33 F.3d 667, 669 (6th Cir. 1994)).

B

21 U.S.C. § 841(b)(1)(C) requires a prison sentence of twenty years to life if the defendant has a prior drug conviction, sells illegal drugs, and "death or serious bodily injury results from the use of" those drugs. Although our circuit has not decided if § 841(b)(1)(C) requires proof of proximate cause, six other circuits have addressed the issue. All six have held that the use of the passive words "if death or serious bodily injury results from the use of" eliminates any requirement that the distribution be the proximate cause of the victim's death or that the death be foreseeable. *United States v. Houston*, 406 F.3d 1121, 1124 (9th Cir. 2005); *United States v. Carbajal*, 290 F.3d 277, 284 (5th Cir. 2002); *United States v. Soler*, 275 F.3d 146, 153 (1st Cir. 2002); *United States v. McIntosh*, 236 F.3d 968, 973 (8th Cir. 2001); *United States v. Robinson*, 167 F.3d 824, 831 (3d Cir. 1999); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994). Furthermore, our circuit has stated in dicta that "the statute is, in effect, a strict liability statute with respect to injury or death of another arising out of the distribution of drugs." *United States v. Rehmann*, 226 F.3d 521, 525 (6th Cir. 2000), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377, 385 (6th Cir. 2002).

At oral argument, Atkins's counsel argued that these cases "did not preclude" the district court from giving a superseding cause instruction. Even if this statement is correct, it overlooks the

fact that Atkins never asked for such an instruction. On plain error review, it is not enough to say that the district court could have granted Atkins's request for such an instruction. Instead, Atkins must show that the district court was required to give such an instruction *sua sponte*, and that failure to do so was "so clearly erroneous as to likely produce a grave miscarriage of justice." *Newsom*, 452 F.3d at 605 (citation omitted).

A circuit split generally bars a finding of plain error. *United States v. Madden*, 515 F.3d 601, 608 (6th Cir. 2008); *United States v. Williams*, 53 F.3d 769, 772 (6th Cir. 1995). Here, we do not have a circuit split and thus cases on both sides. Instead, we have six circuits on the government's side, none on the defendant's side, and dicta from our circuit on the government's side. If a circuit split bars a finding of plain error, a 6-0 score in the government's favor, buttressed by dicta from this circuit in the government's favor, certainly bars plain error. Therefore, even if we assume, contrary to our fellow circuits, that the statute requires proof of proximate cause, and even if we further assume that one heroin addict's failure to seek medical treatment on behalf of another addict could have been a superseding cause, *cf. United States v. Rodriguez*, 279 F.3d 947, 951 (11th Cir. 2002) (holding that it is not), Atkins's claim fails because he cannot prove plain error.[3]

_____

[3] We leave for a more appropriate case the question of whether to join our sister circuits in holding that § 841(b)(1)(C) does not require proof of proximate cause or the foreseeability of death. *See PDK Labs Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) (reasoning that "if it is not necessary to decide more, it is necessary not to decide more"). Likewise, we note, but do not rule on, the Third Circuit's view that even if the statute does not require proximate causation:

in some cases it is possible that the death or serious bodily injury which "results from the use of a [controlled] substance" may be so remote a consequence from the criminal conduct of the defendant with respect to the substance that a court might

C

Atkins also makes three related arguments that can be summarized, and rejected, briefly. First, he points to *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000), which held that the government could not apply § 841(b)(1)(C) to all members of a heroin conspiracy without showing that an addict's death was reasonably foreseeable as to each member of the conspiracy. *Id.* at 403. *Swiney* addressed co-conspirator liability under *Pinkerton* and the Guidelines *Id.* at 406. *Swiney* is irrelevant here because Atkins is not being held responsible for someone else's actions based on his status as a co-conspirator, but is being punished for his own actions. *See Soler*, 275 F.3d at 152.

Second, Atkins suggests that the Guidelines require proof that McKinney's death was foreseeable. He relies on U.S.S.G. § 1B1.3(a)(1)(B), which states that a defendant's "relevant conduct" for the purpose of sentence enhancements consists of "all reasonably foreseeable acts and omissions" of his co-conspirators. This reliance is misplaced. The government does not seek to hold Atkins accountable for McKinney's death through the relevant conduct provisions in the Guidelines. Instead, the government specifically indicted Atkins for personally selling the lethal heroin and it proved its case to a jury, so the "relevant conduct" rules are not relevant.

---

conclude that it would not be consistent with congressional intent to apply the mandatory 20-year minimum sentence. Wherever, if anywhere, that line might be is of no concern to us now. In this case, Robinson conspired to distribute the heroin and a person to whom it almost immediately was distributed consumed it and died as a result. Surely, here the mandatory minimum sentence is applicable.

*Robinson*, 167 F.3d at 831–32.

Third, Atkins contends that under *Morissette v. United States*, 342 U.S. 246 (1952), our court can and should read into the statute a *mens rea* requirement because strict liability crimes are disfavored. He overlooks the fact that the statute already has a *mens rea* requirement. It applies only to defendants who knowingly sell illegal drugs. Atkins satisfied it by knowingly selling heroin. If Atkins had thought he was selling Advil, but he was really selling heroin, then he would have a point, but that was not what happened.

III

Finally, Atkins argues that the evidence was not sufficient to support his conviction. This argument raises the question of "whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). A conviction will be reversed for insufficient evidence only if it is "not supported by substantial and competent evidence upon the record as a whole. Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (citations and quotations omitted).

This "very difficult hurdle for a criminal appellant," *United States v. Rayborn*, 495 F.3d 328, 337 (6th Cir. 2007) (quoting *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007), is even higher here because Atkins admits that he did not preserve this issue below by making a timely Rule 29 motion. Therefore, we review only for a "manifest miscarriage of justice," meaning that "we only reverse a conviction if the record is *devoid* of evidence pointing to guilt." *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (emphasis added) (citations omitted).

Atkins cannot approach, let alone clear, this hurdle. In challenging the sufficiency of the evidence only as to count 1, he does not dispute that he sold heroin, conspired to sell heroin, or sold heroin to someone under 21; he only disputes that on December 14, 2004, he sold the heroin that killed McKinney. That heroin, he suggests, came from "Pat," aka Ryan Moss. As evidence for his theory, Atkins points to Perrin's admission that Moss told Perrin that Moss's name "better not come up" at trial, and suggests that Perrin fingered Atkins out of a fear of Moss. While this theory makes for a good closing argument, on appeal it is the kind of challenge to a witness's credibility that offers a defendant no help. *See Wheaton*, 517 F.3d at 365.

Atkins posits alternative, innocuous explanations for the prosecution's evidence. While his explanations might permit a reasonable juror to acquit Atkins, they do not require every reasonable juror to acquit, and they certainly do not establish a "manifest miscarriage of justice;" therefore, they do not establish that the evidence was insufficient to convict him. Atkins points to testimony that Moss sold heroin in the same area as Atkins and that Moss occasionally appeared on behalf of Atkins for a drug deal. Atkins also makes much of the fact that Perrin did not actually see Atkins hand over the drugs, and he highlights the jury's request during deliberations to review Perrin's testimony on this point. As quoted earlier, Perrin specifically said that Atkins sold the heroin to McKinney. Atkins insists that this testimony is ambiguous because Perrin tacitly admits to not seeing Atkins hand over the drugs because Perrin was looking down at the time and also because Perrin identifies the dealer only as "he." *See ibid.* But the entire context removes the ambiguity because before this exchange Perrin said that he had called Atkins. Furthermore, the prosecution's final question was whether Perrin had "any doubt" who sold the fatal heroin. Perrin answered "no," and said that the

dealer was Atkins. The jury's request shows that it considered this testimony carefully (for which it should be commended), and then chose to accept it, which it was entitled to do.

Given that Atkins must show that the record is "devoid of evidence" of his guilt, Perrin's testimony alone would be enough to sustain the conviction. However, the record includes much more evidence pointing to Atkins's guilt. Nine other addicts corroborated Perrin's testimony by identifying Atkins as their primary source of heroin. The police caught Atkins attempting to sell heroin three days later at the exact same intersection where McKinney bought the fatal heroin. Atkins's cell phone records show multiple calls between Perrin and Atkins the night McKinney died, and also show that the two phones were moving closer together. These records support Perrin's timeline and identification of Atkins, and they show a pattern from which the jury was free to infer a drug deal. The record is more than sufficient to sustain Atkins's conviction.

IV

The judgment of the district court is AFFIRMED.