**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0567n.06

No. 18-2139

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 12, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff–Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| STEVEN CRAIG WHYTE, | ) | |
| | ) | **OPINION** |
| **Defendant–Appellant.** | ) | |
| | ) | |

**BEFORE: MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** This case presents yet another tragic chapter in the ongoing opioid crisis. On October 15, 2016, one young man from Kalamazoo, Michigan (Steven Whyte) sold heroin that ended up in the hands of another young man from the area (Adam Boomers). Boomers overdosed on Whyte's heroin, and died shortly thereafter. Federal prosecutors, who had been tracking Whyte for several months, then charged Whyte with a variety of heroin-and-gun-related offenses, including for selling Boomers heroin that "resulted in" Boomers's death. Whyte vehemently denied the government's allegations, particularly with respect to Boomers's death, claiming that he was being set up by a different Kalamazoo drug dealer (Corvin Reed). However, on March 28, 2018, following a six-day trial, a jury found Whyte guilty on all counts. And, because Whyte had been convicted of a prior felony drug offense, federal law required the district court to sentence Whyte to life in prison, which it did on September 27, 2018.

Whyte now challenges the jury's verdict and the district court's sentence, as well as various evidentiary rulings the district court made over the course of his trial. We **AFFIRM**.

## I. BACKGROUND

### A. Indictment

On October 27, 2016, a grand jury indicted Whyte on the following four counts: (1) conspiracy to distribute and to possess with intent to distribute heroin between December 2015 and February 2016, (2) possession with intent to distribute heroin, (3) being a felon in possession of a firearm, and (4) possession of a firearm in furtherance of drug trafficking. R.1 (Indictment) (Page ID #1–4). Then, on March 22, 2017, the grand jury issued a superseding indictment. R.24 (Superseding Indictment) (Page ID #54). The superseding indictment modified the prior indictment in two ways. First, it enhanced count (1) to "conspiracy to distribute heroin *resulting in death*," and extended the conspiracy to last between December 2015 and October 2016. *Id*. at 1 (Page ID #54). Second, it added a count (5) for "distribution of heroin resulting in death." *Id*. at 5 (Page ID #58). And, notably, because Whyte had a prior felony drug conviction on his record, these two new counts carried with them the threat of a mandatory life-without-parole sentence. *See* 21 U.S.C. § 841(b)(1)(C) (mandating sentence of "life imprisonment," without the possibility of parole, for a person who distributes heroin resulting in "death or serious bodily injury," *if* that person has a "prior conviction for a felony drug offense"); *see also* R.26 (Information) (establishing Whyte's prior convictions and warning Whyte that, if convicted, he would be subject to "increased minimum and maximum penalties").

Whyte nonetheless pled not guilty to all five counts, and a jury trial accordingly commenced on March 20, 2018.

## B. Trial

Over the course of five days, the government presented 19 witnesses and a plethora of accompanying exhibits. This evidence fell into three general camps. *First*, evidence collected from a February 11, 2016 search of two houses associated with Whyte, including evidence about an illegal firearm found at one of those residences. *Second*, evidence collected from cell phones and social-media accounts connected to Whyte and his co-conspirators. *Third*, and most importantly, testimonial and circumstantial evidence implicating Whyte in the October 15, 2016 heroin sale that resulted in Adam Boomers's death.

*Search Evidence*: Various Kalamazoo narcotics officers testified that, after they caught Whyte and his primary co-conspirator (Keon Peterson) selling heroin to government informants on February 11, 2016, they (the officers) executed search warrants at the adjacent residences where Whyte and Peterson made the sales. *See, e.g.*, R.98 (Trial Tr. Vol. I at 159) (Page ID #677); R.99 (Trial Tr. Vol. II at 257–58 (Page ID #775–76). Once inside the residences, the officers testified, they found substantial amounts of drug-related paraphernalia, thousands of dollars in cash, and approximately 20 grams of heroin. R.99 (Trial Tr. Vol. II at 309–22, 334) (Page ID #827–40, 854). The officers also found a loaded .25 caliber handgun hidden underneath a couch on which Whyte occasionally slept. R.98 (Trial Tr. Vol I at 175–80) (Page ID #693–98). Although Whyte's mother (Kimberly Whittaker), who resided at the residence containing the couch, claimed not to know to whom the gun belonged, R.100 (Trial Tr. Vol. III at 446–47) (Page ID #964–65), Whyte's

younger brother (Timothy Whittaker), who also resided at the residence, testified that he thought the gun belonged to either Whyte or Peterson, based on an interaction he had with Peterson in which Peterson came over to the house to pick up the case containing the gun, R.99 (Trial Tr. Vol. II at 365–67, 378–79) (Page ID #883–85, 896–97).

*Social-Media and Cell-Phone Evidence*: The government next presented numerous communications between Whyte, Peterson, and others, which, viewed holistically, demonstrated that Whyte and Peterson regularly sold heroin to others in the neighborhood, both before and after the February 11, 2016 search. *See generally* R.100 (Trial Tr. Vol. III at 610–13, 633–36, 640–44) (Page ID #1128–31, 1151–54, 1158–62); R.101 (Trial Tr. Vol. IV at 696–717, 726–31) (Page ID #1214–35, 1244–49). This evidence also showed that Whyte and Peterson jointly maintained possession over the handgun found underneath Whyte's couch, in that they bragged about their possession of the firearm on their social-media accounts and in their text messages to friends. For example, the government showed the jury an image recovered from Whyte's phone in which Whyte and Peterson are touting the firearm while sprinkling drugs in front of the camera, R.100 (Trial Tr. Vol. III at 642) (Page ID #1160), as well as a text exchange that took place only days before the February 11 search, in which Whyte and Peterson joke about "accidentally" misplacing "the .25.," R.101 (Trial Tr. Vol. IV at 706–07) (Page ID #1224–25). The jury also learned that, at one point in time, Peterson had apparently featured the at-issue firearm on his Facebook profile. *See* R.100 (Trial Tr. Vol. III at 611) (Page ID #1129) (Q: "I'm handing you, Officer Rieser, what's been marked and previously admitted as Government's Exhibit 14 [the .25 caliber handgun]. Do you recognize that?" A: "Yes, this is the same firearm that's pictured from [Keon Peterson's]

4

Facebook profile."). Moreover, to ensure that the jury understood some of the more esoteric terms used in Whyte and Peterson's drug-related communications, the government briefly put a DEA agent on the stand (Thomas Burns) to explain this terminology, along with other relevant aspects of the heroin trade. *See* R.101 (Trial Tr. Vol. IV at 818–40) (Page ID #1336–58) (defining words such as "cut," "re-up," and "the trap").

*Boomers's Death Evidence*: Finally, the government offered a variety of evidence elucidating how Boomers purchased heroin from Whyte the night of October 15, 2016, and how that purchase resulted in Boomers's death. In so doing, the government relied largely (but by no means exclusively) on the testimony of Corvin Reed, a neighborhood marijuana dealer who testified against Whyte in exchange for a lenient plea agreement. R.100 (Trial Tr. Vol. III at 502–06) (Page ID #1020–24). Simply put, Reed testified that, on the night of October 15, Whyte, Boomers, and himself were all at an apartment complex called Hilltop Apartments (albeit not together). And, Reed explained, after witnessing Boomers get ripped off by one Hilltop heroin dealer (Miguel Peake, who apparently sold Boomers fake heroin), he (Reed) agreed to help Boomers out by purchasing "real heroin" for Boomers from Whyte. *Id*. at 518–24 (Page ID #1036–42). So, Reed continued, he bought some heroin from Whyte (who was sitting in his car in the Hilltop parking lot), and then, in turn, sold the drug to Boomers. *Id*. at 524–30 (Page ID #1042–48). The next day, Reed learned that Boomers had been found dead in his van, right where Reed had handed him the heroin. *Id.* at 530 (Page ID #1048). Although Reed initially denied playing any part in these events, he later relented and agreed to cooperate with the police. *Id.* at 537–39 (Page ID #1055–57).

To buttress Reed's narrative, which was, of course, inherently suspect, the government presented corroborating call records, text messages, and surveillance video, in addition to expert medical testimony and physical evidence collected from Boomers's van. This evidence generally showed the following: One, that Whyte and his girlfriend were in their car, parked in the Hilltop parking lot, around the same time Boomers arrived at the Hilltop apartments. R.101 (Trial Tr. Vol. IV at 766–67, 771–74) (Page ID #1284–85, 1289–92) (surveillance video). Two, that Reed and Boomers interacted with each other in the Hilltop parking lot in a manner commensurate with Reed's testimony. *Id*. at 767–74 (Page ID #1285–92) (surveillance video). Three, that, around the same time as that interaction, Whyte received a text message inquiring, "Bro, can I gt a 20 for 10 rt quick?", *id.* at 747 (Page ID #1265), which accorded with Reed's memory of the transaction he made with Whyte that night, R.100 (Trial Tr. Vol. III at 524) (Page ID #1042). Four, that, shortly after these interactions, paramedics discovered Boomers's (deceased) body in his van in the Hilltop parking lot, surrounded by heroin residue and other drug paraphernalia. R.99 (Trial Tr. Vol. II at 398–406) (Page ID #916–24); R.101 (Trial Tr. Vol. IV at 851) (Page ID #1369). Five, that, during their examination of Boomers's van, paramedics also discovered a non-illicit, unused substance, which appears to have been the "fake heroin" Boomers initially purchased from Peake. R.101 (Trial Tr. Vol. IV at 777, 851) (Page ID #1295, 1369). And, six, that Boomers had in fact consumed heroin shortly before his death, and that, but-for Boomers's consumption of heroin, Boomers would not have died. R.100 (Trial Tr. Vol. III at 496–98) (Page ID #1014–16) (forensic pathologist testimony); R.101 (Trial Tr. Vol. IV at 812–15 (Page ID #1330–33) (medical toxicologist testimony).

*Remainder of Trial*:   Following this evidentiary presentation, the government rested. Whyte then moved for a judgment of acquittal, arguing (1) that Reed's testimony, "just standing alone," was too "flawed" and unreliable to support a conviction on the "resulting in death" charges, and (2) that, because no "live witness" connected the handgun to Whyte's heroin sales, and because the photographs and videos merely showed that Whyte and Peterson liked being photographed with guns (but not that they actually used them in their trade), the "possession of a firearm in furtherance of [a] drug conspiracy" claim must fail.  R.102 (Trial Tr. Vol. V at 877–81) (Page ID #1395–99).  The district court denied the motion.  *Id*. at 886–95 (Page ID #1404–13).

Then, rather than put on an affirmative defense, Whyte simply chose to proceed to closing arguments.  In closing, Whyte's counsel declined to defend Whyte on the firearm, conspiracy, or possession charges (contrary the earlier motion for acquittal), and, instead, focused solely on counts (1) and (5), *i.e.*, the "resulting in death" charges.[1]  Consequently, Whyte's counsel spent his entire closing argument attacking Reed's credibility, and pointing out that, because the surveillance video did not directly show Reed purchasing the heroin from Whyte, Reed could just as easily have purchased the deadly heroin from someone else in the Hilltop complex.  *See, e.g.*, R.103 (Trial Tr. Vol. VI at 990–91) (Page ID #1508–09).  The government responded to this line of attack at length in its closing argument.

---

[1]Indeed, Whyte's counsel twice informed the jury that he would not "insult their intelligence" by arguing about anything other than the "resulting in death" charges. R.103 (Trial Tr. Vol. VI at 985, 994–95) (Page ID #1503, 1512–13).

The district court then gave the case to the jury. After approximately six hours of deliberation, the jury returned a verdict of guilty on all five counts.[2]

## C. Sentencing

As noted above, because Whyte had prior felony drug convictions, federal law required the district court to sentence Whyte to life in prison on counts (1) and (5). *See* 21 U.S.C. § 841(b)(1)(C). Further, because Whyte's total offense level was 43,[3] and because Whyte had an extensive criminal history (a "category VI," to be specific), the federal sentencing guidelines affirmatively recommended that Whyte be sentenced to life in prison. R.88 (Revised Presentence Investigation Report ("PSR") at 39); *see also id.* at 23–33 (recounting Whyte's lengthy criminal history).

At sentencing, Whyte argued that his sentence violated the Sixth and Eighth Amendments, and the PSR erred in including a sentencing enhancement for "maintaining a premises for the purpose of manufacturing or distributing a controlled substance." R.106 (Sentencing Tr. at 7–13) (Page ID #1573–78). However, the district court rejected each of these arguments, *id.* at 22–30 (Page ID #1588–96), and ultimately imposed a life-without-parole sentence, plus an additional 60 months for the "possession of a firearm in furtherance of drug trafficking" charge, *id.* at 30–34 (Page ID #1596–1600). Although the district court acknowledged that life-without-parole was a

---

[2]Although the jury initially informed the district court that it had "reached impasse" on counts (1) and (5), R.103 (Trial Tr. Vol. VI at 1024) (Page ID #1542), following an *Allen* charge, *id.* at 1027–31 (Page ID #1545–49), and another hour of deliberation, the jury returned a unanimous verdict.

[3]Technically, Whyte's offense level was 47 (because of sentencing enhancements he received for "maintaining a premises for the purpose of manufacturing or distributing a controlled substance," and for "obstruction of justice"). R.88 (Revised Presentence Investigation Report ("PSR") at 19–20). However, because the maximum offense level under the guidelines is 43, Whyte's final "total offense level" was 43. *Id.*

"tremendously powerful," "harsh" penalty for a "29-year-old man," he went onto to say that, whether viewed under the Eighth Amendment or under the sentencing guidelines, "this is one of those cases [that] warrant[s] a life sentence." *Id*. at 28 (Page ID #1594). The district court reached this conclusion, not only because a young man died as a result of Whyte's conduct, but because, in its view, Whyte should have been "aware from his own near-death experience[s] [with drugs] of the incredible destructive potential of the drugs." *Id*. at 29 (Page ID #1595); *see also* R.88 (PSR at 34–38) (detailing Whyte's history with drugs).

This appeal followed.

## II. DISCUSSION

On appeal, Whyte raises three sets of issues: (A) evidentiary issues, (B) sufficiency of proof issues, and (C) sentencing issues. We address each in turn.

## A. Evidentiary Issues

We review a district court's evidentiary rulings for abuse of discretion. "A court abuses its discretion when it relies on clearly erroneous findings of facts, improperly applies the law, or employs an erroneous legal standard, or when we are firmly convinced that the trial court committed a clear error of judgment." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (quotation omitted). And, to add an additional layer of deference, even if the district court abuses its discretion by, for example, admitting an improper piece of evidence, we will reverse

and remand for a new trial only if it is more likely than not that the district court's error "materially affect[ed] the verdict." *Id.* (discussing "harmless error" rule).[4]

Whyte argues that the district court committed reversible error in two ways here. First, by permitting DEA Agent Thomas Burns to offer opinion testimony about the meaning of certain "plain English" drug trafficking phrases used in Whyte's and Peterson's text messages. And, second, by permitting the government to show the jury several unfairly "inflammatory" photos of Whyte and Peterson flaunting cash, drugs, and firearms.

### 1. Opinion Testimony

Under Federal Rule of Evidence 702, a person with "specialized knowledge" qualified by his or her "knowledge, skill, experience, training, or education" may give "expert" opinion testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. District courts are afforded "considerable leeway" in interpreting this rule in the context of a particular trial. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). However, "a district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quotation omitted). In the law-enforcement context, for instance, we generally affirm the admission of expert testimony that "interpret[s] intercepted conversations

---

[4]Because the evidentiary rulings at issue here are non-constitutional, the "more likely than not," or "preponderance of the evidence," standard applies. "In contrast, when an error of *constitutional* magnitude occurs, the government must prove *beyond a reasonable doubt* that the error did not affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

[using] 'slang, street language, and the jargon of the illegal drug trade,'" *United States v. Young*, 847 F.3d 328, 350 (6th Cir. 2017) (quoting *Kilpatrick*, 798 F.3d at 379); *see also United States v. Johnson*, 488 F.3d 690, 698–99 (6th Cir. 2007), so long as the district court does not allow the expert law-enforcement witness either to relay the "government's theory of the case to the jury" under the guise of jargon interpretation, *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013), or to "interpret" plain English statements that a reasonable juror could understand on their own, *cf. United States v. Allen*, 716 F. App'x 447, 453 (6th Cir. 2017) (discussing this limitation in the context of Fed. R. Evid. 701(b)).

Here, the district court did not abuse its discretion in allowing Agent Burns to testify about various aspects of the heroin and marijuana trade, and to then interpret the following "drug trafficking jargon" for the jury's benefit:

- "buying houses and businesses to keep clean money"
- "if you have 70, I'll make it super fat"
- "I'm going to get another half tonight"
- "cut"
- "re-up"
- "the trap"
- "gray"
- "OG"
- "got another eighth of the strongest"
- "lemon cush real sticky"
- "I need a 60 of boy, Bro. Sick already and need to feel better"
- "front"
- "hot"

R.101 (Trial Tr. Vol. IV 827–36) (Page ID #1345–54).  Although a reasonable juror *might* have understood what some of these phrases meant without Agent Burns's testimony, the government was well within its rights to assume otherwise, and to attempt to ensure that the jury understood

that the numerous text messages exchanged between Peterson, Whyte, and their customers were part and parcel of a conspiracy to distribute heroin (and, occasionally, marijuana). *See, e.g.*, *Young*, 847 F.3d at 351 (permitting law-enforcement expert to opine as to the meaning of "a quarter," in the context of the crack-cocaine trade). Moreover, Agent Burns testified on this subject for only nine transcript pages (in a 1,000 page transcript), and in no way attempted to relay "the government's theory of the case" under the guise of jargon interpretation, like the FBI agent in *Freeman*. Indeed, for this reason, too, even if the district court erred in permitting aspects of Agent Burns's testimony, any such error was harmless. *Allen*, 716 F. App'x at 453.

## 2. Photographs

Under Federal Rule of Evidence 403, a district court "may exclude relevant evidence if" that evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As with expert witnesses, district courts are accorded "wide discretion" in determining the admissibility of evidence under Rule 403. *United States v. Abel*, 469 U.S. 45, 54 (1984). Moreover, in the context of Rule 403, unfair prejudice "does *not* mean the damage to a defendant's case that results from the legitimate probative force of evidence." *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999) (emphasis added) (quotation omitted). "[R]ather, it refers to evidence which tends to suggest decision on an improper basis." *Id*. (quotation omitted). Thus, when the government is attempting to prove that a defendant was part of a criminal conspiracy to distribute drugs, it is generally not "unfairly prejudicial" for the jury to see proof that the defendant and/or their co-conspirators associated themselves with cash,

guns, and drugs. *See, e.g.*, *United States v. Jenkins*, 313 F.3d 549, 559–60 (10th Cir. 2002); *cf. United States v. Stone*, 218 F. App'x 425, 439 (6th Cir. 2007) (concluding that district court overseeing a drug trafficking trial did not abuse its discretion in allowing testimony about the defendant's possession of firearms because "Sixth Circuit precedent recognizes the relevance of firearms in the execution of drug trafficking conspiracies").

As an initial matter, here, it is not clear what evidence Whyte finds objectionable under Rule 403. That is, it is not clear if Whyte is objecting to the government's *entire* presentation of photos found on his and Peterson's social-media accounts, or to some *subset* of that presentation. This lack of clarity is doubly confusing because, although Whyte objected to a series of photos the government displayed on day three of the trial, *see generally* R.100 (Trial Tr. Vol. III at 633–46) (Page ID #1151–64), Whyte later withdrew that objection (at least in part) after the government significantly "culled" its presentation of related evidence for day four of the trial, R.101 (Trial Tr. Vol. IV at 681–85) (Page ID #1199–1203). However, we need not concern ourselves with this procedural question because, even if Whyte did object to the government's entire social-media presentation, the district court did not commit reversible error in admitting any of the at-issue photographs. Evidence that Whyte (and/or Peterson) took photos of themselves flaunting cash, guns, and drugs could not possibly have led the jury to convict Whyte on "an improper basis," *Gibbs*, 182 F.3d at 430, because Whyte was on trial for, among other crimes, being part of a heroin-distribution ring and possessing a firearm in furtherance of that drug-trafficking ring. More still, even if the district court erred on this count, any such error was harmless given the (equally incriminating) evidence found in the February 11, 2016 search of the two homes connected to

Whyte—all of which, Whyte agrees, was fair game for the jury to consider. *Jenkins*, 313 F.3d at 560.

**B. Sufficiency of Proof Issues**

We review challenges to the sufficiency of evidence de novo. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). However, "[w]hen reviewing for the sufficiency of evidence in support of a jury verdict, we view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences from the testimony"; we do "not 'weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury.'" *Id*. (quoting *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)). Accordingly, if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must uphold the jury's verdict. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

Whyte levies two challenges regarding the sufficiency of the evidence here. First, he challenges the jury's conviction on the "possession of a firearm in furtherance of drug trafficking" count. And, second, he challenges the jury's conviction on the "resulting in death" element of the "distribution of heroin resulting in death" and "conspiracy to distribute heroin resulting in death" counts.

### 1. Possession of a Firearm in Furtherance of Drug Trafficking

Federal law criminalizes possessing a firearm for use "in furtherance of" a "drug trafficking crime." 18 U.S.C. § 924(c). "Possession may be actual or constructive, and need not be exclusive." *United States v. Kelsor*, 665 F.3d 684, 691–92 (6th Cir. 2011) (quoting *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010)). However, to prove the "in furtherance of" element,

14

"the Government must show 'a specific nexus between the gun and the [drug trafficking] crime charged,' and that the firearm 'was strategically located so that it [was] quickly and easily available for use.'" *United States v. Ham*, 628 F.3d 801, 808 (6th Cir. 2011) (quoting *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)). In deciding whether the government has met its burden on the "specific nexus" portion of this standard, the jury may consider "(1) whether the gun was loaded, (2) the type of weapon, (3) the legality of its possession, (4) the type of drug activity conducted, and (5) the time and circumstances under which the firearm was found." *Id*. at 808–09 (quotation omitted). This inquiry exists "to help distinguish possession in furtherance of a crime from 'innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.'" *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013) (quoting *Mackey*, 265 F.3d at 462).

Here, Whyte argues that no rational juror could have found that he possessed the .25 caliber handgun found underneath his (occasional) bed during the February 11, 2016 search, or that he used that handgun "in furtherance of" heroin trafficking. We disagree.

With respect to "possession," the record showed not only that the handgun was found underneath a couch/bed associated with Whyte, but that Whyte and Peterson openly flaunted their possession of the gun on their social-media accounts, and in their text-message exchanges. Moreover, Whyte's younger brother (Timothy Whittaker) explicitly testified that he thought the gun belonged to either Whyte or Peterson, an assertion Whyte did not attempt to call into question at trial. That was enough for a rational juror to find in favor of the government on the possession element.

15

With respect to the "in furtherance of" element, the record showed that the police found the at-issue handgun in close proximity to cash, drug paraphernalia, and heroin, and that the gun was loaded at the time the police found it. There is also no dispute that Whyte was a felon, and was therefore legally barred from owning a firearm. And, to the extent the search evidence left any uncertainty, the social-media and text-message evidence further solidified that a connection existed between the gun and Whyte's and Peterson's drug-distribution activities. Accordingly, a rational juror could have reasoned that Whyte's handgun was "strategically located" under his couch "so that it [was] quickly and easily available for use," and that the other relevant factors supported finding a "specific nexus" between Whyte's possession of the handgun and his heroin distribution. *Ham*, 628 F.3d at 808; *accord Ray*, 803 F.3d at 264–65; *Brown*, 732 F.3d at 576–77; *Kelsor*, 665 F.3d at 692–93; *Mackey*, 265 F.3d at 462.

### 2. "Resulting in Death"

As noted above, federal law imposes enhanced penalties on persons who knowingly distribute a controlled substance that then "results in" a user's death. *See* 21 U.S.C. § 841(b)(1)(C); *Burrage v. United States*, 571 U.S. 204 (2014). To prove that a particular distribution "resulted in" a user's death, the government must show that that distribution was "either an independent, sufficient cause of the victim's death or a but-for cause." *Allen*, 716 F. App'x at 450. "But-for" causation, which is the only kind of causation at issue here, occurs when the distributed drug "'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). Notably, too, "[n]othing in [the Supreme Court's

16

decision in] *Burrage* or the plain language of the statute limits responsibility to only the last person to distribute the drug before the harm occurs." *United States v. Lewis*, 895 F.3d 1004, 1010 (8th Cir. 2018).

Whyte presents two contentions regarding the sufficiency of the evidence here. Whyte first argues that no rational juror could have found that he sold Boomers heroin the night of October 15, 2016 (the "sale argument"). Whyte next argues that, even if he did sell Boomers heroin that night, no rational juror could have found that that heroin constituted the "but-for" cause of Boomers's death (the "death argument"). Again, we disagree on both points.

The problem with Whyte's sale argument is that it hinges entirely on non-reviewable credibility questions. For instance, in his brief, Whyte argues that Corvin Reed's testimony did not "make sense," and that Reed was unreliable because he "used Mr. Whyte to try to escape responsibility for his own wrongdoing." Appellant's Br. at 29. Whyte also emphasizes that the government agent "conceded" that the "surveillance video camera [it used to corroborate Reed's narrative] had a limited view." *Id.* But, because a rational juror could have credited Reed's testimony (biased as he may have been), and the government's corroborating video and cell-phone evidence (incomplete as it may have been), we cannot now find otherwise. *See Ray*, 803 F.3d at 262 (emphasizing that, when we "review[] for the sufficiency of evidence in support of a jury verdict," we do "not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury").

*United States v. Atkins*, 289 F. App'x 872, 878–79 (6th Cir. 2008) is instructive. In that case, a defendant convicted under § 841(b)(1)(C) similarly argued on appeal that the jury could

have found that a different heroin dealer sold the victim the fatal dose. *Id*. at 878. That is, the defendant pointed out that another (specifically named) dealer operated "in the same area" where the fatal deal occurred, and that the government's eyewitness (who, like Corvin Reed, was testifying pursuant to a plea agreement) "did not actually see [the defendant] hand over the drugs." *Id*. We rejected these arguments out of hand and observed that, while defendant's theory made "for a good closing argument," "on appeal it is the kind of challenge to a witness's credibility that offers a defendant no help." *Id*. The same is true here.

Whyte's death argument falters on similar grounds. In essence, Whyte contends that, because the government's toxicologist could not say for certain what the "fake heroin" substance found in Boomers's van was, perhaps *that* substance killed Boomers. Appellant's Br. at 28. Not only did Whyte fail to raise this argument either in his motion for acquittal or in his closing argument, which limits our (already quite limited) scope of review, *see United States v. Al-Maliki*, 787 F.3d 784, 796 (6th Cir. 2015), but a rational juror could easily have found that this argument lacked merit. That is, the evidence at trial showed (1) that Boomers almost certainly did not ingest the "fake heroin" substance (because it was still intact at the time of Boomers's death), (2) that that substance was "not a controlled substance" (so it could not have constituted an alternative source of heroin), and (3) that, even if Boomers had ingested a bit of that substance, heroin was undoubtedly the "but-for" cause of Boomers's death. And, on this the last point, the government's expert testimony was unrebutted and unequivocal:

> **Q:** Following your full exam of Adam Boomers were you able to reach a final conclusion about the cause of death for him?
>
> **A:** Yes.
>
> **Q:** And what was that final conclusion?
>
> **A:** A multiple drug intoxication.
>
> **Q:** Can you indicate for the jury what that means?
>
> **A:** There were multiple drugs in his system that essentially led to his death.
>
> **Q:** Dr. Fisher-Hubbard, were you able or can you as a medical professional and medical examiner make a determination as to whether or not the heroin that was found in his system was a but-for cause of Mr. Boomers's death?
>
> **A:** I believe that the presence of heroin was important in determining the cause and manner of death in this case, and I do believe that heroin was the main contributor.
>
> **Q:** Do you believe that Mr. Boomers would have died had it not been for the heroin in his system?
>
> **A:** I do not believe he would have died.
>
> **Q:** If he hadn't taken the heroin that you found?
>
> **A:** Correct.

R.100 (Trial Tr. Vol. III at 497–98) (Page ID #1015–16); *accord* R.101 (Trial Tr. Vol. IV at 812–15 (Page ID #1330–33) (medical-toxicologist expert testimony). The jury was well within its rights to credit this testimony, and to find that Whyte's heroin killed Boomers.[5]

## C. Sentencing Issues

Whyte raises two constitutional challenges to his sentence, and two sentencing guidelines challenges. Again, we address each in turn.

---

[5]This testimony (and accompanying toxicology evidence) distinguishes this case from *United States v. Ewing*, 749 F. App'x 317 (6th Cir. 2018), a recent case in which we reversed a "resulting in death" heroin conviction, and which Whyte cites in his brief. There, we reversed the jury's verdict because there was "an unexplained gap in the evidence" between the drug the defendant sold the victim (heroin mixed with fentanyl) and the drug that appeared to have caused the victim's death (*just* fentanyl). *Id*. at 329. Given this gap, and "the lack of any evidence or testimony to explain" it, we ruled that no rational juror could have found, beyond reasonable doubt, that the defendant's particular drug sale killed the victim (as opposed to a different sale after the fact). *Id*. at 330. No such "unexplained gap in the evidence" exists here, and Whyte has never argued to the contrary.

### 1. Constitutional Challenges

We review constitutional challenges to a sentence de novo. *Kelsor*, 665 F.3d at 701. Here, Whyte raises both a Sixth Amendment challenge and an Eighth Amendment challenge.

Whyte first argues that his sentence violates the Sixth Amendment because, generally speaking, only a jury may find facts that increase a maximum penalty, *see, e.g.*, *Alleyne v. United States*, 570 U.S. 99 (2013), but, here, the jury did *not* find that Whyte committed the prior felony drug offenses the government relied on in enhancing Whyte's sentence, *see supra* at 2 (explaining statutory scheme). Rather, Whyte stipulated that he committed the offenses, R.101 (Trial Tr. Vol. IV at 850) (Page ID #1368), in accordance with *Old Chief v. United States*, 519 U.S. 172 (1997). But, as Whyte candidly acknowledges, this argument is foreclosed by binding Supreme Court precedent, *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). Appellant's Br. at 31. And, as we have explained before, although some members of the Supreme Court have called *Almendarez-Torres*'s continuing vitality into question, "*Almendarez-Torres* is still good law and will remain so until the Supreme Court explicitly overrules it." *United States v. Smith*, 881 F.3d 954, 960 (6th Cir.) (quotation omitted), *cert. denied*, 139 S. Ct. 85 (2018); *accord United States v. Young*, 847 F.3d 329, 369 (6th Cir.), *cert. denied*, 138 S. Ct. 147 (2017); *United States v. Pritchett*, 749 F.3d 417, 434 (6th Cir.), *cert. denied*, 135 S. Ct. 196 (2014).

Whyte also argues that his (statutorily prescribed) life-without-parole sentence violates the Eighth Amendment's prohibition on "cruel and unusual punishments." U.S. Const., amend. VIII. In making this argument, Whyte primarily emphasizes his lack of intent to harm Boomers, and the fact that *Reed* actually handed Boomers the fatal dose of heroin. Appellant's Br. at 33. Whyte

also notes society's "evolving standards of decency" with respect to mandatory-minimum punishments for drug offenses, citing Congress's recent passage of the First Step Act as evidence of that evolution. *Id.* at 34–35; *see also United States v. Wiseman*, 932 F.3d 411, 416–17 (6th Cir. 2019) (discussing the Act).

Whyte is correct that his sentence is severe, and perhaps even misguided as a matter of criminal-justice policy. But, unfortunately for Whyte, binding precedent forecloses this claim, too. That is, although the Supreme Court has held that the Eighth Amendment bars legislatures from imposing a "sentence for a term of years" that is "grossly disproportionate for a particular defendant's crime," *Graham v. Florida*, 560 U.S. 48, 60 (2010), we have repeatedly rejected Eighth Amendment challenges to the mandatory life-without-parole provisions in 21 U.S.C. § 841(b)(1), even when faced with sympathetic defendants. *See, e.g.*, *United States v. Potter*, 927 F.3d 446, 454–55 (6th Cir. 2019); *Young*, 847 F.3d at 363–64; *Kelsor*, 665 F.3d at 701; *United States v. Graham*, 622 F.3d 445, 452–54 (6th Cir. 2010); *cf. Harmelin v. Michigan*, 501 U.S. 957 (1991) (upholding similar life-without-parole sentencing scheme under state law). For instance, in *Graham*, we affirmed a mandatory life sentence for a defendant who simply *sold* drugs, without directly causing any injury, and whose only two prior drug felonies were from nearly a decade prior, when the defendant was a teenager. *Graham*, 622 F.3d at 453–55. By comparison, Whyte sold the heroin that led to Adam Boomers's death, *and* committed numerous, often violent, crimes in the months and years before that fatal sale, when he was indisputably an adult. *See* R.88 (PSR at 23–33) (reviewing Whyte's criminal history). Under the circumstances, then, it would make no sense for us to conclude that Whyte's particular life-without-parole sentence was "grossly

disproportionate" to the severity of his crimes. *Graham*, 560 U.S. at 60. Moreover, because Congress deliberately excluded drug sales "resulting in death" from the First Step Act's sentencing reforms, *Wiseman*, 932 F.3d at 417, Whyte cannot claim that that legislation shows that his sentence violates society's "evolving standards of decency," *cf. Potter*, 927 F.3d at 455 (rejecting similar argument).

### 2. Sentencing Guideline Challenges

Whyte's sentencing guideline challenges merit little discussion. Whyte first argues that the district court erred when it applied the two-point sentencing enhancement for "maintaining a premises for the purpose of manufacturing or distributing a controlled substance." Appellant's Br. at 37–40; *see* U.S.S.G. § 2D1.1(b)(12). But we need not discuss this issue (or the parties' accordant dispute over what standard of review to apply to this issue) because any error resulting from the district court's application of the enhancement was harmless. Not only did this two-point enhancement not affect Whyte's total offense level under the sentencing guidelines, *see supra* at n.3, but the district court sentenced Whyte in accordance with a *mandatory* statutory scheme (which, for the reasons explained above, was constitutionally permissible). *See United States v. Steel*, 609 F. App'x 851, 854 (6th Cir. 2015) (declining to address applicability of drug premises enhancement where any error was plainly "harmless"); *see also* Appellant's Br. at 40 (acknowledging that Whyte's sentencing enhancement argument becomes relevant only if "this Court vacate[s] [Whyte's] sentence and remand[s] for resentencing based on [the] constitutional arguments").

Whyte similarly argues that his sentence was "substantively unreasonable" under 18 U.S.C. § 3553(a). Appellant's Br. at 40–41. But, again, because the district court was required to impose the sentence that it did (and because the sentence was constitutionally permissible), the sentence was reasonable as a matter of law. *Graham*, 622 F.3d at 454, 464. And, in any event, the district court weighed and balanced whether Whyte's life sentence was "fair under the 3553 factors," and concluded that it was. R.106 (Sentencing Tr. at 28) (Page ID #1594). There was no abuse of discretion here.

## III.  CONCLUSION

For these reasons, we **AFFIRM** Whyte's conviction and sentence.